## HYMAN *v.* WHEELER and others.

*(Circuit Court, D. Colorado. December 23, 1886.)*

1. **MINES AND MINING—LODE—WHAT IS.**
   An impregnation, to the extent to which it may be traced as a body of ore, is a vein, lode, or ledge, under section 2322, Rev. St. U. S., giving to the owner of a mineral claim, containing the top or apex of a vein, lode, or ledge, the right to follow the same beyond the vertical side lines, but between the vertical end lines, whether the ore is separated from the country rock by planes or strata of that rock visible to the eye, or is determinable in other ways, as by assay and analysis.

2. **SAME—LODE—BODY OF ORE.**
   A body of mineral, or mineral bearing rock, in the general mass of country rock, so far as it may continue unbroken, and without interruption, is a lode, whatever the boundaries may be.

3. **SAME—LODE—BOUNDARIES.**
   With well-defined boundaries, very slight evidence of ore within such boundaries will prove the existence of a lode.

4. **SAME—LODE—CASUAL CONCENTRATION.**
   If the entire mass of limestone in which a body of ore lies has been mineralized in the same way as the body of ore, and to some extent, and the body of ore is a casual concentration of unusual richness, the body of ore is not a lode.

5. **SAME—LODE—MINERALIZED STRATA ALONG A PLANE OF CONTACT.**
   Strata lying along the plane of contact between blue and brown limestone, if mineralized to the extent of showing valuable minerals, and distinguishable from other parts of the country rock by carrying ore, and by association with the plane of contact, constitute a lode, as far as the strata lying on or near the contact may show ore in appreciable quantities.

6. **SAME—IDENTITY OF LODES—PERSISTENCE OF ORE.**
   In determining whether a lode extends from defendants' claim to plaintiff's location, and has its apex therein, the persistence of the ore through these and the intervening claims is of little weight, unless there is evidence in plaintiff's claim tending to show a crevice or continuous ore or mineralized rock; with such evidence it is of considerable weight.

7. **SAME—APEX—EXTENT.**
   Plaintiff's location and defendants' location are some distance apart, and they overlap so that the north end of plaintiff's location is nearly parallel to defendants' location for about the distance of 750 feet. In asserting a right to follow a vein or lode on its dip without his own location and into defendants' location, plaintiff must show the outcrop or apex of such vein or lode to be in his own location throughout the ground in controversy, being the extent of the locations parallel to each other.

8. **EVIDENCE—ADMISSIONS—RECORD OF ANOTHER ACTION ADMISSIBLE AS AGAINST A PARTY.**
   Where one of the defendants in action has been a plaintiff in another action in which his claim was opposed to his claim in the case at bar, the complaint, order of court, and affidavits offered on behalf of plaintiff, are admissible as admissions of said defendant, as against him, but against none of his co-defendants.

9. **WITNESS—CREDIBILITY—INSTRUCTION OF COURT.**
   In regard to a certain witness, the court instructed the jury as follows: "I can scarcely believe that any jury would be willing to accept the testimony of a witness who would declare, upon the stand, that he had made statements in a general way, and for business purposes, outside of the court-room, and with a view to defraud people with whom he was carrying on negotiations, in opposition to his testimony on the stand."

This was an action of ejectment, brought by David M. Hyman, of Cincinnati, Ohio, as the owner of the Durant mining claim, situate on

Aspen mountain, near the town of Aspen, Pitkin county, Colorado, against J. B. Wheeler, of New York city, and his co-defendants, as claimants of the Emma mining claim, situate on the west slope of the same mountain, on the ground that the defendant had sunk a shaft from the surface, and, by means of drifts, levels, and under-ground workings, had broken into, and unlawfully taken possession of, that portion of the Durant vein which, having its outcrop and apex within the Durant surface boundaries, extended downward vertically, passes out of the Durant side lines on the west, and into and through that portion of the Emma claim lying between vertical planes extended downwards through the Durant end lines, produced westerly, in their own direction, across said Emma claim.

The Durant claim was discovered and located by W. S. Clark, Charles Bennett, A. C. Fellows, *et al.*, August, 1879. The Emma claim was located in August, 1880. July 9, 1879, Phil. Pratt and Smith Steele discovered the Spar claim, which adjoins the Durant upon the north, and is situated upon the same mountain and ledge; made their discovery workings upon an outcrop of copper-stained heavy spar, carrying silver ore; and pointed out to the Durant locators a similar heavy spar outcrop upon that ledge as a point at which the Durant locators should do their discovery work, and, for that purpose, withdrew the Spar stakes 50 feet down the hill. Lying to the west of the Spar and Durant claims, and upon the slope of West Aspen mountain, and partly below the Durant and partly below the Spar, are the Washington No. 2, Emma, Aspen, and Vallejo mining claims.

The workings on the Spar claim, which are run from the surface at the point of discovery, upon the contact between blue limestone (a carbonate of lime) and brown limestone, called "dolomite," (a carbonate of lime and carbonate of magnesia,) extend in ore from the surface in the Spar mine to the lowest workings in the Aspen, and are connected with all the under-ground workings in the Vallejo, Washington No. 2, Aspen, and Emma claims. At a point 750 feet south of the Spar discovery, upon the Durant claim, an incline called the "Durant Incline," has been run a distance of 600 feet, and is connected with the under-ground workings in the Spar, Washington No. 2, Vallejo, Emma, and Aspen claims by means of the Washington No. 2 side-line drift, run on the line between the Emma and Washington No. 2, the Emma Central, or No. 6 drift, run about the center of the Emma claim, and the Compromise drift, run on the line made by compromise, as a boundary between the west side line of the Emma claim and the east side line of the Aspen claim. All these workings are run along the line of contact between what is known as the blue lime and the brown lime or dolomite, and which is called by the plaintiff the "vein." The Spar and Durant claims are so located that their east side lines fall to the east of the crest of Spar ridge, and of the contact between the blue and brown lime which outcrops immediately east of and along said crest, and their west side lines fall to the west of the crest of said Spar ridge.

In November, 1883, the defendant Wheeler brought a suit in chancery

against the claimants of the Washington No. 2 lode, being John Jordan and others, which suit is No. 1,386 on the United States circuit court docket, in which he applied for an injunction; claiming that there was a vein having its apex in the Spar claim, and so far departing from a perpendicular in its downward course as to pass beyond the west side line of the Spar, into and through the territory lying below known as the Washington No. 2 claim, and that the owners of said Washington No. 2 claim had sunk to and were removing ore from said Spar vein.

On the hearing of the application for an injunction the defendants in that case contested the existence of the apex of the vein within the Spar claim above the point where they were working, and asserted that the apex which existed for some distance in the Spar claim passed out of its side lines, and ran across the Washington No. 2 claim. Wheeler, the plaintiff in said case, filed a large number of affidavits in support of his position, among them those of W. B. Devereaux, W. J. H. Miller, George W. Lloyd, Phil. Pratt, and James Lyon, in which he showed the existence of a fissure or contact fissure vein, with selvage, slickensides, and other characteristics, with well-defined walls,— the hanging wall being carbonate of lime or calcite, the lower and impure magnesian limestone or dolomite; and that the apex extended from the 1,001 claim on the north end of the Spar, through the said Spar, into, through, and beyond the Durant on the south; and that the same vein was disclosed in the Durant incline that was shown in the Spar and Washington No. 2 claims. On the hearing in this suit Wheeler obtained an injunction, and in the present case the bill, affidavits, and injunction were admitted in evidence on behalf of the plaintiff as declarations of Wheeler.

In the trial of the present case the plaintiff's witnesses testified to the existence of a vein extending from the Spar discovery into and through the Washington No. 2 claim, the Vallejo and Emma, with the outcrop and apex thereof extending from the Spar discovery southward to the mouth of the Durant incline, and thence south to the Visino tunnel and incline, being works upon the Durant claim; thus covering all that portion of the Emma mining claim in controversy in the case. They also testified that the same vein was disclosed in the Durant incline from where it was started upon the Spar outcrop, through its entire extent, to the point where it entered the Compromise drift, and in various small drifts run for short distances from the side of said incline, at numerous points; also in the Visino workings; in certain apex cuts or openings made by the plaintiff along the surface of the Durant claim for the purpose of disclosing and proving up the apex or outcrop of the vein, as well as in drifts and levels in the Durant claim, and in the under-ground workings of the Spar, Washington No. 2, Vallejo, Emma, and Aspen claims, and in the drifts connecting them with the Durant incline; that the ore body or vein was found on the plane of contact between the brown and blue lime, the gangue consisting of heavy spar, occurring at all points in the workings as a nucleus of the vein, associated with disintegrated, ground up, or crushed and mineralized portions of the brown lime, called "short lime," and also copper, iron, silica, lead, and silver ore, having a clay

selvage and slickensides, and portions of the walls striated, with the ore occurring at places in such a manner as to disclose a banded structure characteristic of fissure veins; and that while, in a considerable portion of the workings, ore remained, this was ore which had not been removed, because at the time said work was done it was not commercially valuable; and that this ore was found both upon the foot and hanging walls, with these walls, however, clearly defined and distinctly disclosed at numerous points.

Numerous lines of assays and analyses were made and introduced in evidence, showing the composition of the vein matter and the walls, supporting the position maintained by the plaintiff. Models, maps, photographs, and samples were also introduced as a portion of the plaintiff's evidence. The defendants contended, and many of their witnesses testified, that there was no vein; that the ore occurred in the general mass of the mountain, all of which had been mineralized, and was in the form of impregnations, which occurred without regularity or defined boundaries, gradually fading out into the surrounding rock or limestone, its presence only being detected by means of assays; that silver could be found on the surface, and almost anywhere in the mountain, and that the heavy spar found at the line of contact, and in the mineral claimed by the plaintiff to be the vein, was without significance, being indiscriminately scattered over the mountain, and through it, embedded in brown and blue lime; that the Durant incline did not always follow the contact, and was for a distance of almost 100 feet run through barren rock; that for a considerable distance in said incline the contact was tight or blended, with nothing in the nature of ore in it; that the apex cuts did not disclose the outcrop of a vein, and only showed a contact between brown and blue lime, and sometimes not even that; that the Visino workings and Durant incline were not run upon the same contact. They further contended that, in order to fall within the provisions of section 2322 of the Revised Statutes of the United States, a vein must be a fissure in the earth's crust, filled with mineral matter foreign to the walls, and that the walls must be well defined and easily distinguished, and that the vein filling could not be of the same material or character as the walls, or a part of them. They also claimed that the ore in the workings connected with the Durant incline was not confined to the contact between the brown and blue lime, but was found indiscriminately in each of these limes, and at considerable distances from the plane of contact, and, save by assay and analysis, was in no way distinguishable from the pure brown and blue lime; and in support of this claim instanced drifts claimed to be run in the brown and blue lime. Plaintiff, in rebuttal, claimed that the drifts followed stringers or spurs of ore from the vein, and were therefore only the usual accompaniments of fissure veins.

The witness Thompson, for the defendants, was confronted on his cross-examination with two reports made and circulated by him in an effort to sell the Camp Bird mine, situated upon the same mountain, to a considerable distance south thereof, in which he had asserted the existence

of a vein upon the same contact which was found in the Spar, Durant, Emma, and other claims. He had sworn in his examination in chief that there was no vein on the mountain. The last of these two reports was signed December 10, 1886; the first was issued early in the year. Upon cross-examination he said that these reports were made for the purpose of deceiving people into putting their money into the Camp Bird; that he knew they were false when he issued them; that he was not in this country for his health, and that such things had to be done in mining business, although known to be false.

The case was called December 6, 1886, and the jury returned a verdict December 23, 1886.

*H. M. Teller, C. Reed, J. W. Taylor,* and *C. J. Hughes, Jr.,* for plaintiff.

*Patterson & Thomas, Downing & Franklin,* and *A. W. Rucker,* for defendants.

HALLETT, J., (*charging jury.*) The part which I have to perform in this extended discussion is very brief. I will read to you first section 2322 of the Revised Statutes of the United States, upon which the controversy in this suit is founded:

"The locators of all mining locations heretofore made, or which shall hereafter be made, on any mineral vein, lode, or ledge situated on the public domain, their heirs and assigns, where no adverse claim exists on the tenth day of May, 1872, so long as they comply with the laws of the United States, and with state, territorial, and local regulations not in conflict with the laws of the United States governing their possessory title, shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations. But their right of possession to such outside parts of such veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward, as above described, through the end lines of their locations, so continued in their own direction, that such planes will intersect such exterior parts of such veins or ledges."

The proposition asserted by the plaintiff under that statute is well stated in an instruction asked by the defendants, which I will read to you:

"The proposition asserted by the plaintiff in his complaint is that there is a vein or lode within the limits of the Durant mining claim, which commences at the north end line, near the center of the claim, the top or apex of which extends thence, in a southerly direction, approximately through the center of the claim; that this vein or lode, as shown by the workings of the Durant claim, extends on its dip in a westerly direction, through the Durant claim, and to and beyond the west side line of said claim, thence into the Emma claim, and that the said vein or lode is the part of the vein or lode which they allege exists in the said Emma claim; that the plaintiff may recover, it is essential that every one of his propositions be maintained by a preponderance of evidence in the case. Unless it shall appear to you, by a preponderance of the evidence, that what is asserted by the plaintiff to be his vein extends to and across the west side line of the Durant claim, he cannot

recover; and unless it shall be made to appear by a preponderance of the evidence that the alleged Durant vein or lode extends into and is a part of the vein or lode existing in the Emma claim, then he cannot recover; and unless it shall appear to you that the alleged vein has its apex extending from the Durant incline, in a southerly direction, through the Durant claim, at least so far as the so-called apex cuts have been excavated, then he cannot recover."

The last clause is modified by a statement in what I have written to the effect that it is necessary that the existence of the outcrop and apex should be co-extensive with the Emma location; that is, it should appear as far south as the Emma location goes.

Upon the general propositions contained in that instruction, I have the following to say:

Within the limits to which the investigation of facts before a jury is necessarily confined, this case has been fully and elaborately presented for your consideration. Every fact which may aid you in the decision of the matters in issue is brought to your attention as fully and completely as possible. With models and views of the mountain, and maps of all openings in the mine, with ores from the mine and rocks of the different strata, and assays and analyses showing their value and composition, and by the testimony of many witnesses, the parties have done all in their power to enlighten you in respect to the nature of the controversy. The number of witnesses called by the parties was governed by rule of court, so that one could have no advantage over the other in that respect; and the witnesses are arrayed in point of numbers on party lines, half on one side and half on the other, so as to produce an embarrassing conflict of testimony. Such conflict is not an unusual feature of testimony in a mining suit. They have become so common and general that many thoughtful men entertain doubts as to the value and efficiency of trial by jury in such cases. If a given number of witnesses of fair character and intelligence can be produced at the will of the parties for or against any proposition that may arise in a mining controversy, without reference to the truth of the matter, of course the result of such an investigation cannot be very satisfactory. But if we look to the circumstances upon which such conflicts arise, we shall find that they are not wholly due to partisan zeal. To determine the contents of a mountain from what may be seen on the surface, and in some slight explorations underground, is a matter of such difficulty that differences of opinion, even as to facts open to observation, are to be expected. Openings underground, however extensive, when considered in their relation to the great recesses of a mountain, are scarcely more than a vestibule or point of entrance to the unexplored interior. And in openings under-ground, investigation proceeds slowly and laboriously, with many tests which often fall short of the truth. Every one understands the liability to error and mistake in inspecting under-ground works, and how the rock or ore which appears to one to be of a certain class may to another present a different aspect; so that, in the field of observation, there is ample scope for differences of opinion which in themselves do not impeach the candor and fairness of witnesses. These conflicts of testimony, and the

possibility or probability of error in the testimony of any witness, are worthy of attention in any effort that may be made to harmonize the testimony, and determine the controlling facts.

In the books, and among miners, veins and lodes are invested with many characteristics,—as that they lie in fissures or other openings in the country rock; that they contain materials differing, or in some respects corresponding, with the country rock; that they are of tabular form, and of a banded structure; that some one or several things are commonly associated with the valuable ores; that they have selvages and slickensides in the fissures and openings, and the like. It is not necessary to enumerate all the features by which they are known. Some of these characteristics are said to be common to all lodes and veins, and others of rare occurrence; but, in general, witnesses will take up one or more of them as essential features of a lode or vein, and declare the fact upon the presence or absence of such elements. A party seeking to prove the existence of a lode or vein will naturally rely on any such characteristic that he can find in the ground in dispute, and call witnesses, who will accept that feature as establishing the fact. The party opposed will seek to disprove the proposition advanced against him, and, in addition, to show that all other characteristics of a lode or vein are in the case under consideration entirely wanting. In this way a fierce conflict of testimony is waged as to the existence of one or another distinguishing feature of a lode or vein, and the jury is asked to return a verdict upon the issue thus made. It is apparent, however, that, upon any issue touching the existence of a lode or vein in a place designated, a question whether it has one characteristic or another is a part only of the main question, and, in the presence of other unquestioned elements establishing the existence of a lode or vein, an issue of that kind becomes immaterial. To illustrate that matter, it may be said that, with ore in mass and position in the body of a mountain, no other fact is required to prove the existence of a lode of the dimensions of the ore. As far as it prevails, the ore is a lode, whatever its form or structure may be, and it is not at all necessary to decide any question of fissures, contacts, selvages, slickensides, or other marks of distinction, in order to establish its character. As was said in another case in this court:

"A body of mineral or mineral-bearing rock, in the general mass of the mountain, so far as it may continue unbroken, and without interruption, may be regarded as a lode, whatever the boundaries may be. In the existence of such body, and to the extent of it, boundaries are implied."

If, therefore, we look only to the body of ore developed in the Emma location, the existence of which is not denied, and assume it to be of the form and extent developed in the works, there is no difficulty in recognizing it as a lode. Whether it is in the form of a broken mass of blue and brown lime, between regular walls of the same rocks, or a part of such strata in solid formation, mineralized by replacement of some of their constituents with valuable metals, the result is the same, and the name which science may apply to it is of no importance. An impregnation, to the extent to which it may be traced as a body of ore, is as

fully within the broad terms of the act of congress as any other form of deposit. In discussions at the bar, and in the opinions of witnesses, it was assumed that the character of a body of ore, as coming within or falling without the act of congress, could be determined by classifying it as a segregated or contact fissure vein, or as a bed or impregnation of ore; and that it was a matter of importance to ascertain whether the ore was separated from the country rock by planes or strata of that rock visible to the eye. I see no reason for such distinctions. It is true that a lode must have boundaries, but there seems to be no reason for saying that they must be such as can be seen. There may be other means of determining their existence, and continuance, as by assay and analysis; and certainly the form and mode of occurrence of valuable ore, however controlling and influential in determining its geological character, is not a matter upon which it can be excluded from the terms of the act of congress. All that is said on this point proceeds on the theory that the ore developed in the Emma location is of the form and extent there appearing, as distinguished from the mass of limestone in which it is found; that it is upon the line of contact between blue and brown lime, and that such line of contact marks its presence and continuance throughout the works. There is much in the testimony to support that view. That, however, is for your consideration, to be decided upon the weight of evidence.

If, as contended by defendants, the ore of that mountain is distributed throughout the blue and brown limestones somewhat unequally, but nevertheless generally, and the occurrence of rich ore in the Emma works is fortuitous and accidental, other considerations arise of which it is not necessary to speak at length. In that case the entire body of blue and brown limestone is taken to be ore-bearing rock, and the plaintiff can assert no claim to it outside his own location. If you accept that view, your verdict should be for defendants. Bearing in mind what has been said, if you decide on the evidence that there is a lode in the Emma ground, you have then to consider whether it is practically continuous from thence to and into the Durant location, with an apex or outcrop in that location. That the body of ore, as shown by the works, whatever its character may be, extends through the Washington No. 2 to an outcrop on the Spar location, seems to be clearly established. Some witnesses expressed doubt on the subject, but the weight of testimony supports that conclusion. Testimony as to the appearance and extent of the ore in the Washington and Spar claims was received to explain its general character, and as having some bearing upon the question of its existence and extension into the territory of the Durant location to the south.

The character of a vein or lode, and the country adjoining, can be better and more satisfactorily shown through extensive works than in a small area. What weight shall be given to the fact of the persistence of the ore throughout these claims is to be determined by the jury. Without something in the plaintiff's claim to show a crevice or continuous ore or mineralized rock, it would be of little value. In connection with ev-

idence showing, or tending to show, some such fact, it may be of considerable value. If you find from the evidence that the ore in the several works is in the form of a brecciated vein in a fissure between walls, the extension and continuance of such fissure throughout the territory mentioned by the witnesses may be more readily predicated than the same fact as to the ore or mineralized rock only. Upon that point a part of the charge in the case before mentioned is fully applicable to this case:

"To determine whether a lode or vein exists, it is necessary to define those terms; and as to that it is enough to say that a lode or vein is a body of mineral or mineral bearing rock, within defined boundaries, in the general mass of the mountain. In this definition the elements are the body of mineral or mineral bearing rock, and the boundaries. With either of these things well established, very slight evidence may be accepted as to the existence of the other. A body of mineral or mineral bearing rock in the general mass of the mountain, so far as it may continue unbroken and without interruption, may be regarded as a lode, whatever the boundaries may be. In the existence of such body, and to the extent of it, boundaries are implied. On the other hand, with well-defined boundaries, very slight evidence of ore within such boundaries will prove the existence of a lode. Such boundaries constitute a fissure, and if, in such fissure, ore is found, although at considerable intervals and in small quantities, it is called a lode or vein."

In that view of the evidence, it may be important to consider and determine whether there is a fissure exposed in the several openings of the mine as asserted by the plaintiff; and, if you find that such fissure exists, whether it is practically continuous and unbroken between strata of blue and brown lime from an outcrop in the Durant claim to the Emma ground below. With such a fissure extending in that way, even if it be narrow, and carry ore only slight in quantity, and at considerable intervals, the case of the plaintiff may be regarded as established. If, however, you find that the body of ore developed in the several works constitutes a lode, as already defined, but without a fissure inclosing it, your only guide in ascertaining its extent will be the mineralized rock, which in that view of the testimony is taken to be ore. I have explained to you fully that the strata lying along the plane of contact between the blue and brown lime, if mineralized to the extent of showing value in silver, and distinguishable from other parts of the mountain by carrying ore, and by association with the plane of contact, may constitute a mineralized zone. In that state of facts, the contact of blue and brown lime furnishes a guide for the miner in his search for ore, in so far as the strata forming the contact are mineralized. Such a zone is clearly a lode, within the meaning of the law, extending as far as the strata lying on and near the contact may show ore in appreciable quantities.

If the evidence proves the existence of such a lode, the question will be whether it extends throughout the Durant incline, manifested by ore in appreciable amounts in the strata of the contact. A barren contact between blue and brown lime will not suffice to establish a lode in that incline; it must carry ore to some extent, and of some value. To sum up briefly the matters before you, the body of ore exposed in the works of the mine is to be regarded as a lode, within the meaning of the law,

unless the whole mass of limestone in which it is found has been mineralized in the same way as the body of ore, and to some extent, and this is a casual concentration of unusual richness.

If it is a "lode," under this definition, its existence in the Durant claim, and extension therefrom to the Emma ground, is the next question in order. That question may be considered, in the *first* instance, with reference to the existence or absence of a fissure in the Durant incline and elsewhere, marking the course and continuance of the lode. *Secondly*, if there is no fissure, is the contact between blue and brown lime mineralized in the manner and to the extent before explained? The affirmative of the first and second or third of these propositions establishes the plaintiff's case. The negative of the first, or of the second and third, determines the case for defendants.

Much comment has been made at the bar on the testimony relating to an outcrop or apex of a lode in the Durant location. The plaintiff must show an apex or outcrop within his claim as far south as the Emma claim extends, which is, I believe, about 750 feet. Upon the testimony of the defendants' witnesses alone, there is scarcely room for doubt as to the presence of an outcrop or apex in the mouth of the Durant incline; and it is said that the ore extends down the incline for a distance of 50 or 60 feet. Whether the apex and outcrop extends further south in the Durant claim is for your consideration, upon all the evidence.

There are certain propositions offered by defendants touching the previous suit of *Wheeler* v. *Markell and others* which appear to be correct. The court has admitted, for the consideration of the jury, the bill of complaint, the order of the court, and certain affidavits offered in behalf of the plaintiff, in the case of *J. B. Wheeler* (one of these defendants) v. *C. Markell* (one of these defendants) *et al.* That controversy was one between the Spar and the Washington No. 2 mining claims, adjoining the Durant mining claim upon the north, and they were admitted as giving evidence of some admissions upon the part of the defendant Wheeler of the existence of a vein within the Spar lode mining claim. You are specially instructed that the same cannot be considered by you, nor can they have any weight against any of the defendants, except defendant Wheeler, and therefore can be admitted only as admissions against him. In order to construe them correctly, you should consider the character of the ground, and the amount of openings, at the time of the filing of these affidavits, and the much larger amount of ground opened at the present time; and you will also consider that said Wheeler did not prosecute the suit to a final termination, but dismissed the same of his own volition.

In the matter of the admission of the bill of complaint, the order of the court, and the affidavits of W. B. Devereux and others in behalf of the plaintiff herein, the same were admitted as admissions made by J. B. Wheeler, in 1883, upon the subject of the existence of a vein in the Spar claim and in the Durant. These affidavits are not to be taken as evidence given in this case by those who made the affidavits in support of the claim of the plaintiff that there is a vein in the Durant ground

which extends into, and is a part of, the body of mineral in the Emma claim; but, grouping them all together, they amount simply to the admission by J. B. Wheeler himself of the existence of a vein in the parts of the territory mentioned in the bill of complaint and affidavits, and this admission is not at all conclusive of the proposition contained in the bill of complaint and affidavits, but they are to be taken as evidence so far as such an admission may be considered important in determining the affirmative or the negative of the question in dispute in this suit, and in determining whether or not a vein exists in the Durant as claimed by the plaintiff, and extends into the Emma ground, and is part of the lode or vein claimed to exist there. The said admissions of the defendant Wheeler can only be considered in connection with all the other evidence in the case, and, unless the plaintiff shall establish everything essential to his recovery by a preponderance of the evidence, the said admissions being a part of the evidence in his behalf, it will be your duty to render a verdict for the defendants.

Upon the testimony, gentlemen, I do not intend to make any observations. It has been fully discussed by counsel before you. But the position of the witness Thompson in this controversy which he assumed when on the stand seems to call for some notice in a public way. It is most extraordinary that any witness of fair intelligence and ability should put himself in the position which he assumed on the stand, and, had it appeared to me to be a case in which the act was criminal, I certainly should have taken steps to cause him to be punished for it. But, under the circumstances of this case, and so far as it may affect the issues in this case, you will know how to apply the remedy. I can scarcely believe that any jury would be willing to accept the testimony of a witness who would declare upon the stand that he had made statements in a general way, and for business purposes, outside of the court-room, and with a view to defraud people with whom he was carrying on negotiations, in opposition to his testimony upon the stand. It certainly is a very remarkable instance of the impudence and courage of a man who is destitute of principle.

Upon the other testimony in the case I have, as I said before, no observations to make. You have given patient attention and consideration to it so far, and I trust that in the decision of the case it will receive the consideration to which the importance of the case entitles it.

The verdict was for the plaintiff.