**TITANIUM ACTYNITE INDUSTRIES, and H. O. Aaberg and Stella R. Aaberg, as Trustees of and for the Aaberite Trust, and John E. Byrne, Sr., Winifred Walton Shelton and David C. Edwards, individually and as all of the persons owning and composing said Titanium Actynide Industries, Appellants,**

v.

**William Ray McLENNAN, Appellee.**

**No. 5989.**

United States Court of Appeals Tenth Circuit.

Dec. 1, 1959.

Rehearing Denied Jan. 7, 1960.

Gail L. Ireland, of Ireland, Ireland, Stapleton & Pryor, Denver, Colo. (George V. Kempf, Montrose, Colo., with him on the brief), for appellants other than H. O. Aaberg and Stella R. Aaberg, as Trustees of and for the Aaberite Trust (Robert E. Holland, Denver, Colo., was with him on the brief for H. O. Aaberg and Stella R. Aaberg, as Trustees of and for the Aaberite Trust).

J. H. Holland, of Holland & Hart, Denver, Colo. (Robert P. Davison and James A. Larson, Denver, Colo., with him on the brief), for appellee. Dawson, Nagel, Sherman & Howard, Richard S. Kitchen, Denver, Colo., Groves, Dufford, Turner & Nelson, Grand Junction, Colo.; Bryant, Petrie, Waldeck & King, Montrose, Colo., Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., and Frazer Arnold, Denver, Colo., filed a brief of amici curiae.

Before MURRAH, Chief Judge, and PHILLIPS and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

In 1936 and 1938 defendant and his predecessors in interest located three placer claims [1] in the White Earth Mining District, Gunnison County, Colorado. Shortly thereafter the plaintiffs located 34 lode mining claims covering approximately the same surface area included within the placer claims. In 1952 defendant applied for a patent to his claims and plaintiffs filed an adverse claim and brought this action as required by 30 U.S.C.A. § 30, to determine the right of possession. Although the adverse suit raised several issues, the parties agreed to a trial on the "sole question of whether or not the nature of the mineral deposits lying in and under the ground in question are such that the surface area was subject to mineral location as placer or as lode claims."

Expert testimony, and that of practical miners, was introduced by both parties

---

1. These claims were known as "Tar Baby Placer No. 1," "Tar Baby Placer No. 3," and "Northside No. 13 Placer Mining Claim," and they contained a total of 480 acres.

to describe the several kinds of minerals and their arrangement within the disputed area. The trial court, after hearing the testimony and making a personal inspection of the premises, found for the placer claimant. That decision is challenged as being contrary to the established facts and to applicable principles of law.

The trial court found that the exterior boundaries of the contested area lie within the 8 to 10 square mile surface dimensions of a mass of pyroxenite, and igneous rock containing several different minerals; that listed according to average percentage by volume, these minerals are pyroxene (60%), biotite (15%), magnetite (10%), perovskite (10%), and lesser amounts of apatite and ilmenite; that the minerals are distributed unevenly throughout the pyroxenite so that there are a great number of relatively high mineral segregations arranged in a generally haphazard fashion;[2] that in the discovery pits highly mineralized zones are visible, but they are irregular in shape and have little continuity; that there are no contacts between mineral-bearing material and country rock free of mineralization; rather, any particular zone composed of relatively large amounts of mineral is bounded by rock containing lesser quantities of that same mineral; and that the whole surface of the pyroxenite mass has been weathered and some alluvium has been transported in from surrounding areas. On these facts, the trial judge, a distinguished jurist in the field of mining law, concluded that there were no individual veins or lodes of mineral-bearing rock in place within the area, so as to make lode locations appropriate. This conclusion must be upheld unless the findings were clearly erroneous or unless the legal concept of a vein or lode applied to those facts was wrong as a matter of law. See Iron Silver Mining Co. v. Cheesman, 116 U.S. 529, 6 S.Ct. 481, 29 L.Ed. 712.

The findings of fact have complete support from the testimony of the defendant's experts,[3] and in reality, they are not too much at variance from that part of plaintiffs' evidence directed to actual description of the physical characteristics of the contested area. But the experts did disagree in their opinions as to whether the mineral deposit was subject to lode or placer locations. The question must be resolved from the form and character of the mineral deposit as disclosed by the facts.

The general mining laws of the United States provide two methods of locating and acquiring unappropriated mineral lands. Lode mining claims are required

---

**2.** The U. S. Department of the Interior Geological Survey of the area, written by E. S. Larsen, describes it as follows: "One of the most prominent characteristics of the pyroxenite is its variability: Almost any exposure a few feet long will show in different parts conspicuous differences in texture and to a less extent in the proportion of minerals. Less common bodies carry variable amounts of minerals not found in the normal rock. The different types are present in streaks, many of them less than a foot across, and in bunches mostly less than a few tens of feet across. Many of the variations show sharp contacts, and the different kinds of rock appear to intrude one another in a most complex way. Some of the streaks and many of the less regular bunches show a gradational zone, usually narrow, to the normal pyroxenite."

**3.** Illustrative of this evidence describing the deposit is the testimony of a mining engineer, which was as follows:

"A. Because, as I say, to me it is a big huge massive deposit that is spread over this whole area. It is a complex deposit, that is true, and it is variable, but it covers the whole area.

"Q. What are the various different minerals that you found when you examined this area? A. Magnetite, the various mica minerals, vermiculite, perovskite, it is very difficult with the naked eye to separate perovskite from magnetite.

"Q. Were you able to find any walls in between those various minerals that you have mentioned? A. I would not describe them as walls. As I say, there is a variation in grade, and to me there are no walls there, and, if there are, if there could be a difference, it would be so gradational that you could never pin it down either vertically or horizontally."

by 30 U.S.C.A. § 23 to be made upon "* * * veins or lodes of quartz or other rock in place bearing * * * other valuable deposits * * *." Placer claims may be located upon other "forms of deposit, excepting veins of quartz, or other rock in place * * *." 30 U.S.C.A. § 35. In a discussion of the application of these statutes for the exploration and acquisition of unappropriated mineral lands, the court, in Webb v. American Asphaltum Mining Co., 8 Cir., 157 F. 203, 205–206, said:

> "Section 2318 provides that all 'lands valuable for minerals' shall be reserved from sale, except as otherwise expressly directed. Section 2319 declares that 'all mineral deposits in lands' belonging to the United States shall be open to exploration and purchase. Section 2320 specifies the method by which 'veins or lodes of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, copper or other valuable deposits' may be secured, and section 2329 provides that 'claims for placers including all forms of deposit, excepting veins of quartz or other rock in place may be entered and patented.' The 'mineral deposits' treated in this legislation include nonmetalliferous deposits, alum, asphaltum, borax, guano, diamonds, gypsum, resin, marble, mica, slate, amber, petroleum, limestone, and building stone, as well as deposits bearing gold, silver, and other metals, and the term 'lands valuable for minerals' in the law means all lands chiefly valuable for any of these mineral deposits rather than for agricultural purposes. Northern Pacific Ry. Co. v. Soderberg, 188 U.S. 526, 534–537, 23 S.Ct. 365, 47 L.Ed. 575; Pacific Coast Marble Co. v. Northern Pacific R. R. Co., 25

Land Dec.Dept.Int. 233, 240. Thus it clearly appears that the plan of this legislation was to provide two general methods of purchasing mineral deposits from the United States —one by lode mining claims where the valuable deposits sought were in lodes or veins in rock in place, and the other by placer mining claims where the deposits were not in veins or lodes in rock in place, but were loose, scattered, or disseminated upon or under the surface of the land. The test which Congress provided by this legislation to be applied to determine how these deposits should be secured was the form and character of the deposits. If they are in veins or lodes in rock in place, they may be located and purchased under this legislation by means of lode mining claims; if they are not in fissures in rock in place but are loose or scattered on or through the land they may be located and bought by the use of placer mining claims. Reynolds v. Iron Silver Mining Co., 116 U.S. 687, 695, 6 S.Ct. 601, 29 L.Ed. 774; Clipper Mining Co. v. Eli Mining & Land Co., 194 U.S. 220, 228, 24 S.Ct. 632, 48 L.Ed. 944."

There can be no unyielding rule of thumb definition of a vein or lode; each case must be decided with reference to its own peculiar facts. Lindley on Mines, Vol. 1, 3d Ed., § 289.[5] It is often said that the mineral-bearing rock, to constitute a lode, must be fixed in the enclosing mass of the surrounding country (Meydenbauer v. Stevens, D.C. Alaska, 78 F. 787; Book v. Justice Min. Co., C.C.Nev., 58 F. 106; Lindley on Mines, Vol. 1, 3d Ed., §§ 293, 294), it must have fairly well-defined boundaries separating it from the country rock. Iron Silver Mining Co. v. Cheesman,

---

5. Referring to the acceptance of judicial definitions of lode deposits or placer locations, Lindley said:

"The danger lies in accepting the definitions of either as broadly comprehensive or rigidly restrictive, and attempting to apply them to conditions not within the reasonable contemplation of the law, or in attempting to deprive a locator of the benefit of his discovery, if the thing discovered cannot be forced into the mold of arbitrary definition, either popular or scientific."

supra [116 U.S. 529, 6 S.Ct. 483]; [6] Mc-Mullin v. Magnuson, 102 Colo. 230, 78 P.2d 964; San Francisco Chemical Co. v. Duffield, 8 Cir., 201 F. 830, certiorari denied 229 U.S. 609, 33 S.Ct. 464, 57 L.Ed. 1350. In McMullin v. Magnuson, supra, this language was quoted with approval:

"Thus the two essential elements of a lode are (a) the mineral-bearing rock, which must be in place and have reasonable trend and continuity, and (b) the reasonably distinct boundaries on each side of the same." [102 Colo. 230, 78 P.2d 968.]

However, the boundaries or walls do not have to be visually discernible, but instead can be established by assay analysis. Hyman v. Wheeler, C.C.Colo., 29 F. 347; Beals v. Cone, 27 Colo. 473, 62 P. 948; Lindley on Mines, Vol. 1, 3d Ed. § 294. The country rock need not be totally barren of minerals, but the mineral content of a lode must be appreciably greater than that of the surrounding rock. Grand Central Min. Co. v. Mammoth Min. Co., 29 Utah 490, 83 P. 648. A lode usually is said to exist where the body of mineral-bearing rock has such continuity and apartness that it can be traced in the general enclosing mass. Hyman v. Wheeler, supra; Eureka Consolidated Min. Co. v. Richmond Min. Co., C.C.Nev., Fed.Cas.No.4,548, affirmed 103 U.S. 839, 26 L.Ed. 557. In Globe Mining Co. v. Anderson, Wyo., 318 P.2d 373, Justice Parker of the Wyoming Supreme Court presents a thorough analysis of

what has been said by writers and the courts about the difficulties not only of the courts, but of practical miners, in attempting to define veins, lodes and rock in place. See note 4, 318 P.2d 377.

The three placer claims were located for the mineral vermiculite, a form of altered mica, and a good grade of vermiculite was tested and developed in nearby mills.

It is quite evident here that plaintiffs' claim covered no well-defined veins or lodes as those terms are ordinarily used, unless it can be said that the entire area was a single lode. The record discloses that we are dealing with a large, shapeless, coarsely grained mass of ore which, with the possible exception of the disintegrated top portion, is "in place" in the sense that it is in a fixed position. However, the mass extends over several miles of country and has no known dimensions or boundaries and none of the ordinary lode characteristics, not even as to the method of recovering the minerals. The theory that the entire mass is a lode in place with undetermined boundaries would create a single lode covering somewhere between 8 to 12 square miles.

The import of the testimony of plaintiffs' witness Griffith, who made some of the locations for the plaintiffs on deposits of black iron,[7] was that the whole area was the same. When asked if he found a vein on one of the claims, he answered: "We found black iron all through there on all those claims." Another of plaintiffs' witnesses, Ziegler, an oldtime miner

6. In the Cheesman case, the court quoted Justice Field in Eureka Consolidated Mining Co. v. Richmond Mining Co., Fed. Cas.No. 4,548, as follows:
"* * * 'It is difficult to give any definition of this term as understood and used in the acts of congress, which will not be subject to criticism. A fissure in the earth's crust, an opening in its rocks and strata made by some force of nature, in which the mineral is deposited, would seem to be essential to a lode in the judgment of geologists. But to the practical miner, the fissure and its walls are only of importance as indicating the boundaries

within which he may look for and reasonably expect to find the ore he seeks. A continuous body of mineralized rock lying within any other well-defined boundaries on the earth's surface, and under it, would equally constitute, in his eyes, a lode. We are of the opinion, therefore, that the term as used in the acts of congress is applicable to any zone or belt of mineralized rock lying within boundaries clearly separating it from the neighboring rock.' * * *"

7. The record does not show the mineral characteristics of "black iron."

also employed by plaintiff to make locations, in answer to an inquiry about the existence of lode formations, testified: "I would say that this black iron is similar all the way through the extent of the deposit over there." The witness further testified: "It is what I would call, from a prospector's viewpoint, a tremendous deposit of 'black iron', with no 'hanging wall' or footwall or anything else." [8] The witness Thompson, a geologist and metallurgical engineer who had made an extensive examination of the property over a period of years, performing drilling as well as surface work, testified that the mineral segregations lacked continuity and depth; that they were not bounded or defined by footwalls or hanging walls, but the entire deposit was "ore from the grassroots." He also testified that the entire surface area was covered by alluvial and eluvial [9] pyroxenite material to unknown depths; that this was brought about by weathering and erosion and that he had never found a place where a bulldozer could not cut a trench through the pyroxenite. It was the opinion of this witness that "you cannot have a lode where the walls are more of the same thing," and that from a practical point of view the claims were properly classified as placer.

8. Alfred G. Hoyl, an experienced mining engineer and geologist who was familiar with the land and had done assessment work thereon, testified that in his opinion it should be considered "placer ground." By way of explanation, he testified:

"Q. Would you state the reasons for that opinion? A. Well, my reasons are quite practical. To begin with, the area is rather large in extent. Now, over this large area almost all of it is ore. Now, it varies in grade over this area and laterally as well as vertically. There is a considerable variation, but it is still ore. Now, the alluvial placer covers a considerable part of the area as well as the eluvial placer. Furthermore, there have been a tremendous number of cuts, you might say, for a mining property such as this made over the whole extent of the property, and most of those have been made with a dozer or hand pick and shovel, and in addition to that we have drilled approximately 10 holes in this ground varying from about 12 to 145 feet in depth, and we find that this weathering extends for some distance into the ground. It has been our understanding that in areas nearby in similar geologically, in this geological igneous stock that there are patented placer claims.

"Q. How large an area does this stock cover? A. It covers approximately 12 square miles I would say.

"Q. You say that your drilling discloses the fact that weathered and soft material existed down under the surface for some distance. How far does that extend? A. Well, in some holes we have encountered it at depths of approximately 100 feet. I would like to qualify that in that we found this large crystalline structure, that is, from the standpoint of rock it is quite incompetent and will break down very easily. We have had our holes eroded just from the air used in drilling and widen out and produce a considerable amount of drill cuttings more from the erosion of the air than from the drilling.
* * *

"Q. Are you familiar with the so-called, what the plaintiff refers to as veins of magnetite-perovskite that extend in this area and are seen on the surface? A. I don't know just what he does refer to, because to me they are not veins. This material extends over this whole area in varying degrees both vertically and horizontally, and the important minerals are magnetite, perovskite, and vermiculite.

"Q. They extend through in the entire area, is that correct? A. Yes, Sir."

9. The witness defined "eluvial" and "alluvial", as follows:

"* * * A. Eluvial means that we are dealing with a weathering process or disintegration of a rock body which has been caused by the weathering forces which are present in the environment where the rock is located, and when we refer to an eluvial placer we in general mean that there has been very little transportation of the material. Of course, there will have always been some if from no other source than wind.

"Alluvial placers, we generally imply that transportation has been involved; the disintegration of the rock particles was caused by much the same forces which cause disintegration of the material in eluvial placers. In addition, there may be—there may have been some more disintegration caused by the transporting medium, wind, water, glacial ice, and so on."

■ There is no need for us to attempt a precise definition of a lode or vein. It is enough if the legal principles, when applied to the court's findings, indicate that there were no lodes within the area. While it is true that the higher mineral segregations were fixed in place in the pyroxenite, the evidence discloses that even assay tests could indicate no ascertainable boundaries setting them apart from the general mass. The bodies of higher mineral content were irregular in shape and lacked continuity so that extreme difficulty would be encountered in attempting to trace them, even if selective mining methods were advisable. The evidence is without conflict that the minerals can best be mined by traditional placer methods. The area was generally considered to be placer territory, in spite of three very old lode claims which had gone to patent without contest. In an adverse proceeding, a Colorado court had upheld a placer claim within the same deposit. Black Mica Mines, Inc. v. Vernon and Swank, Civil Action No. 3076, Dist.Ct. of Gunnison County, Colo. Under these circumstances, the trial court's findings that there were no veins or lodes in the area in question were not clearly erroneous and "the theory that the whole mass can be called a lode or a vein and be located as a lode mining claim on that basis" is not tenable under the facts of this case.

Concern is expressed that, in effect, the trial court's findings and conclusions establish the broad principle that mineral-bearing rock in place may never be located as a lode unless there is a conventional vein formation, and that they permit a placer location on mineral-bearing rock in place. We think the decision goes no further than to find that there were no lodes or veins in the mineralized mass and that the entire mass of pyroxenite was not shown to be a single lode or vein.[10]

There is no merit in plaintiffs' contention that the trial court erred in striking the testimony of the witness Koch or in giving consideration to the placer patent issued on ground within the same area and in refusing to consider three nearby patented lode claims.

■ Koch, an employee of the Bureau of Land Management, testified on the issue of whether the ground was locatable as placer or as lode. The court struck the testimony when the witness refused on cross-examination to produce a report which he had made following his examination of the premises and had submitted to the Bureau. We need not consider the court's action in striking this testimony, because if there was error, it was not prejudicial, as the testimony was merely cumulative of other evidence and added nothing new to plaintiffs' case. Grand Valley Water Users' Ass'n v. Zumbrunn, 8 Cir., 272 F. 943; In re Livingston's Estate, 102 Colo. 148, 77 P.2d 649; Inyo Marble Co. v. Loundagin, 120 Cal.App. 298, 7 P.2d 1067.

■■ Complaint also is made of the court's action in largely disregarding evidence admitted to show that lode locations had been made within the disputed area. The weight to be given that evidence was for the trial court, whose determination in that regard did not constitute error. Nor did the trial court commit error by considering a Colorado District Court decision which held that a nearby area was placer, for, while not conclusive, it could be considered the same as any other case involving similar facts.

Affirmed.

---

10. The court used this language: "So here, if the deposit, this mineral deposit occurs in veins or lodes of rock in place, of necessity the claims would have to be located as lode claims. Otherwise, they would be locatable as placer claims under the terms of the statute."