## MORGAN v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. April 2, 1909.)

No. 2,844.

1. PUBLIC LANDS (§ 13*)—RIGHT TO CUT TIMBER FROM MINERAL LANDS—CONSTRUCTION OF STATUTE.

Under Act June 3, 1878, c. 150, § 1, 20 Stat. 88 (U. S. Comp. St. 1901, p. 1528), providing that all citizens and bona fide residents of certain states and territories "shall be and are hereby authorized and permitted to fell and remove for building, agricultural, mining, or other domestic purposes any timber or trees growing or being on the public lands, said lands being mineral and not subject to entry under existing laws of the United States except for mineral entry," the right to cut timber is not restricted to the particular spot or minor tract of land on which mining is being actually done, but extends to adjacent lands, they being mineral, although no mining development work has been done thereon; and whether or not a tract in question not so developed is mineral within the meaning of the statute is a question of fact, in an action to recover for timber cut, to be inferred by the jury from its surroundings and appearance, and applying to the facts their own common sense and observation.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 16–18; Dec. Dig. § 13.*]

2. PUBLIC LANDS (§ 13*)—RIGHT TO CUT TIMBER FROM MINERAL LANDS—EVIDENCE OF CHARACTER OF LAND.

To justify the cutting of timber under such act, it is not essential to prove that the tract from which it was cut, if not developed as mining ground, presents such indications of mineral as would justify a prudent person experienced in such matters in the belief that it could be worked for mineral at a profit.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 16–18; Dec. Dig. § 13.*]

3. PUBLIC LANDS (§ 13*)—ACTION FOR CONVERSION OF TIMBER—MEASURE OF DAMAGES.

A person who cut and removed timber from public land in good faith, in the belief that he had a lawful right to do so under Act June 3, 1878, c. 150, § 1, 20 Stat. 88 (U. S. Comp. St. 1901, p. 1528), permitting the cutting of timber from mineral lands for certain purposes, if not so justified, is liable in damages for the stumpage value of the timber only, and not for the manufactured value.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 17; Dec. Dig. § 13.*]

4. TRIAL (§ 281*)—EXCEPTIONS—REFUSAL OF INSTRUCTIONS.

A general exception to the refusal of instructions in mass is bad if any one of the number was properly refused.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 694; Dec. Dig. § 281.*]

5. TRIAL (§ 83*)—RECEPTION OF EVIDENCE—SUFFICIENCY OF OBJECTION.

A general objection to a question asked a witness as "immaterial" is insufficient to warrant the exclusion of the testimony sought to be elicited unless its immateriality is clearly manifest.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 199; Dec. Dig. § 83.*]

6. EVIDENCE (§ 263*)—ADMISSIONS BY PARTY—RIGHT TO EXPLAIN.

Where, in an action to recover damages for the alleged unlawful cutting of timber from public land, the United States introduced in evi-

dence an affidavit made by defendant before an inspector of the Land Department as an admission of the value of the timber taken, it was error to refuse to permit him as a witness to explain the circumstances under which, and the purpose for which, the affidavit was made.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1022–1027; Dec. Dig. § 263.*]

7. TRIAL (§ 46*)—OFFER OF EVIDENCE—SHOWING PURPOSE OF ADMISSION.

Where the materiality of evidence is not apparent on objection thereto, the party offering it should advise the court of its purpose.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 115–117; Dec. Dig. § 46.*]

In Error to the District Court of the United States for the District of Colorado.

J. E. Simonson, Henry Howard, Jr., and W. G. Simonson, for plaintiff in error.

Ralph Hartzell, Asst. U. S. Atty. (Thomas Ward, U. S. Atty., on the brief), for defendant in error.

Before HOOK and ADAMS, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge. This is a suit instituted by the United States against James C. Morgan (hereinafter designated the defendant) and Louisa B., his wife, for cutting and removing timber from certain public lands situate in Grand county, Colo. The first count of the petition charges that between April, 1902, and April, 1903, the defendant wrongfully and unlawfully entered upon the land and cut and removed therefrom large amounts of timber, of the value of $4,200. The second count charges that between the dates aforesaid the plaintiff was entitled to the possession of certain lumber located in Colorado, cut from the lands aforesaid, of the value of $4,200; that the defendants wrongfully and unlawfully took possession thereof and converted the same to their own use. There was a verdict for the plaintiff in the sum of $2,250 against the defendant James C. Morgan, and of acquittal of Louisa B., the wife.

The answer, after tendering the general issue, alleged that the defendants are citizens of the United States, over 21 years of age, and bona fide residents of the state of Colorado; that while said James C. Morgan was such citizen and resident he entered upon an unsurveyed portion of the public mineral lands not subject to entry under the laws of the United States except for mineral entry, and cut and removed therefrom, in accordance with the law, a small number of trees, for building, agricultural, mining, and other domestic purposes; that the defendant was authorized so to do by Act Cong. June 3, 1878, c. 150, 20 Stat. p. 88 (U. S. Comp. St. 1901, p. 1528).

The said act of Congress authorizes any citizen of the United States and other persons bona fide residents of the state of Colorado to fell and remove, for building, agricultural, mining, or other domestic purposes, any timber or other trees growing or being on the public lands, said lands being mineral, and not subject to entry under existing laws of the United States except for mineral. The evidence

showed that the defendant possessed the requisite citizenship and residence to entitle him to take timber as provided by the statute. His evidence further tended to show that what is known as "scrip" was laid upon a part of the land in question by an incorporated company, from which said Louisa B. Morgan purchased. The defendant undertook himself, with the assistance of an engineer, to survey said lots of ground, and, as he supposed, correctly surveyed them. But as the survey placed the tracts in an oblong shape, instead of in contiguous squares, as prescribed by the United States survey, his surveys were not recognized by the Department of the Interior.

That the land from which the timber was taken was not adaptable to agricultural use is beyond question. It lies on a mountain range about 10,000 feet high, sterile and rocky, exceedingly rugged and difficult of access, without soil to support and a season too short to admit of cultivation for purposes of husbandry. If it was mineral land, the statute authorized the defendant to cut and remove therefrom any and all timber and trees growing thereon for either building, agricultural, mining, or other domestic purposes. The only limitation upon this right was that the timber should not be taken for exportation from the state.

The testimony of the defendant, without contradiction, was that he sold a large portion of the timber cut from the south center tract to mines in that locality, and some was shipped to lumber yards in the city of Denver. In answer to the question for what purpose was the lumber used manufactured from the logs, he replied that it was principally for mining at mines near Georgetown, Central City, and Black Hawk, and the rest was used for building, and none of it was shipped out of the state by him. He further testified that the south 40 was along the face of a very steep hillside, at an angle of 33½ degrees; that two years ago (before giving his testimony) there were only seven days in which there was no frost there; that, on account of the inaccessibility of this timber and the difficulties in the way of getting it out, the enterprise was without any profit and was financially disastrous.

On behalf of the defendant it was shown that what is known "as Yankee Hill Mine," a series of a dozen mines, was about four or five miles from the lands in question; that they were valuable mines; that the Vacquez mining camp was about 2½ miles southwest from the mill at the second cutting, which were valuable mines, and were worked the summer before and the summer of the trial of this case; that the Bressler mines, consisting of eight 20-acre tracts or claims in the neighborhood, had "quite a little bit of work done on them, and placer locations have been made all over this ground;" that the placer lands referred to by one of the witnesses joined the middle cutting in question, and the location post thereof was set one-half foot south of his north line; that they had operated about four years; that the side hill directly east of this claim had been located as placer land; that there was a copper lode location in the vicinity being developed and operated; that what is known as "Caldwell's placer locations" were about two miles north of where his mill was.

Near the land in question was a place called "Spruce Lodge." A witness on behalf of the defendant testified that he had lived for a number of years in the community where the lands are situate; that he had prospected that mountain range for 12 miles as a miner, and also the lands in question; that he had located a mine about 1¼ miles from Spruce Lodge, and several other claims in that locality, the nearest of which was one-half to three-quarters of a mile from where the defendant's sawmill was set the second time; that he had assays made of the mineral taken from his mines, showing 28 per cent. copper, 11 oz. gold, and 9 oz. silver, and considered the mine valuable; that there were leads on the land where the defendant cut the timber, but he made no location there because the difficulty of transportation would consume the profits. There was other evidence by the defendant tending to show the close proximity to the lands in question of mines opened and worked.

The witness called on behalf of the government, an engineer and assayer, testified that he had surveyed and prospected over the mountain region in question to the east and west of the tracts on which the defendant did the cutting; that while he found float indications he found none of such grade as to justify him, in his judgment, in making locations. On cross-examination he said:

"I found mineral-bearing quartz on the top of the ground—that is indicative of mineral land—but I never prospected this particular tract."

The issue, therefore, to have been submitted to the jury, first, was whether or not the lands from which the defendant cut the timber were within the purview of the statute. Does the statute imply that before the citizen can enter upon the land, and cut and remove timber, there must have been actual discovery and development work showing the presence all over it of valuable mineral deposits, workable at a profit? The courts exercising jurisdiction over the region where the statute is operative have given construction and application to it broader, more practical and consonant with its purpose and spirit, than an affirmative answer to the foregoing inquiry would indicate. Judge Hallett, who presided in the District of Colorado, had occasion, early after its enactment, to apply this statute, shown by his ruling made in 1889 in United States v. Edwards (D. C.) 38 Fed. 812. There no mines had been actually discovered and developed on the tract of land from which the timber had been cut, but valuable mines had been opened within a few miles of the locus. After adverting to the fact that the region was mountainous, rugged, and unfitted for cultivation or pasturage, he said of the statute:

"It will be observed that the lands referred to from which timber may be taken are such as are subject to entry as mineral lands, as distinguished from those which may be occupied under the pre-emption, homestead, and other acts relating to agricultural lands."

Further on he said:

"It is not altogether a question of finding valuable ore or metal in the ground from which the timber is taken. Obviously the act of Congress is not limited to land which is or may be actually occupied for mining purposes. After location made, the timber on a mining claim belongs to the claimant,

and it cannot be supposed that Congress intended to give it to another. Furthermore, the grant is of timber on lands subject to mineral entry, and not subject to entry as agricultural lands, which means such as may be taken for mining purposes, as distinguished from such as have been taken in that way. Without attempting to describe mineral lands in a way which may be sufficient for all cases arising under the act of 1878, it seems clear that the lands mentioned in the complaint and in the statement of facts are of that character. They are in a mountainous region, in the vicinity of valuable mines, and have some indications of valuable metals in them. They are unfit for cultivation and for pasturage, and are not subject to entry under the pre-emption or other laws relating to agricultural lands."

Presumably it was not intended by Judge Hallett, by the last clause quoted, to imply that merely because the tract of land may be unsuited for agricultural purposes it is to be regarded as mineral land; but apparently the separate statement was intended to be linked up with what preceded; that is to say, as the land was unfit for cultivation or pasturage, being in a mountainous region, in the vicinity of valuable mines, etc., of like characteristics, it might be treated as "being mineral."

Hon. Henry M. Teller, who was United States Senator from Colorado at the time of the enactment of this statute, afterwards in 1882, when Secretary of the Interior, gave expression to his view of the intent and construction of the statute in instructions, as follows:

"Where the lands are situated in districts of country that are mountainous, interspersed with gulches and narrow valleys, and minerals are known to exist at different points therein, such lands, in the absence of proof to the contrary, will be held to be mineral in character; but when there are extensive valleys, plains, or mountain ranges, and no known mineral exists, the land may be considered and treated as nonmineral."

The construction of this statute has been before the Court of Appeals of the Ninth Circuit, within whose jurisdiction this act is operative. See United States v. Basic Company, 121 Fed. 504, 57 C. C. A. 624, and United States v. Rossi, 133 Fed. 380, 66 C. C. A. 442. Without repetitious extracts from the opinions, the following summary, in our judgment, expresses the proper construction of the statute: The conception of Congress in its enactment was to encourage the development of mines in the public lands of that region. As mineral-bearing lands were usually situate in mountainous, barren regions, unadapted to agriculture and the founding of homes, and the timber thereon may be essential not only for direct use in and about the mines to be opened or operated, but for building homes and fences for the use of the people desiring to occupy and develop such communities, license is given to any citizen, resident of the state or territory, to enter upon such public lands and remove the timber "for building, agricultural, mining, or other domestic purposes, said lands being mineral, and not subject to entry under existing laws of the United States except for mineral." The term "other domestic purposes" was not employed in the narrow sense of household purposes, but in the broader sense of other industries in the locality, including the right of persons cutting and removing the timber to sell it for domestic consumption, as contradistinguished from exportation from the state. United States v. United Verde Copper Co., 196 U. S. 207, 25 Sup. Ct. 222, 49 L. Ed. 449.

In furtherance of this legislative policy, the right to cut timber should not be restricted to the particular spot, or minor tract of land, on which mining is being actually done, as there may be an absence of timber thereon sufficient for the miners' use or other domestic purpose. It follows, as a logical sequence, that the citizen may enter upon and take timber from adjacent lands, they being mineral, although no min-ing development work has been done thereon. In such conjuncture the question arises, how, in the absence of such actual discovery and development, is it to be determined whether or not it be mineral land? The courts apply to the situation the rule of noscitur a sociis, as one of practical sense and necessity. If contiguous or near thereto, in the sense of neighborhood—"vicinity, adjoining district"—there be lands on which mineral has been actually discovered by development work, and the land in question be of like topography, or delineation, with the same surface indications of what is known as a lead or float in a placer mining region, it would warrant the inference that such tract is also mineral land within the meaning and intent of the statute.

From the premises it follows that it is not essential that on the particular piece of land from which the defendant removed timber any mine should have been opened, disclosing mineral in paying quality or quantity. It was sufficient if, by reason of the presence of valuable mineral in the neighboring lands of like surface characteristics, a reasonable, prudent person likely would have been led to expect to find mineral in the adjacent tract. The citizen of average intelligence, in taking timber from public land claimed to be mineral, when charged with trespass thereon should be judged by surrounding appearances, such as whether or not there had been discovery and development of such mineral on contiguous or nearby land of like physical characteristics and surface indications. In recognition of this view of the statute, it has been held that surveys made by the government of mountainous regions, indicating the lands as mineral in character, are competent evidence in favor of the person who has cut timber therefrom. United States v. Van Winkle, 113 Fed. 903, 51 C. C. A. 533.

The paragraph of the charge of the court complained of, which directed the jury on this important issue, is as follows:

"Now before you can find that this defense, to the effect that the defendant had a right to take the timber because it was on mineral lands, has been sustained, you must find that those lands were valuable for minerals. That, however, does not mean, gentlemen of the jury, that there must be positive proof that they have been worked or can be worked at a profit for the mineral they contain. If the mineral indications are such on these lands as would justify a reasonable and prudent person who has had some experience and has knowledge in that sort of thing to spend his money and labor on these lands for the purpose, and in the hope, and in the honest belief that he could work them at a profit, that would be sufficient evidence to justify you in finding that these were valuable mineral lands. In that connection, also, it is proper for you to take into consideration any evidence of lands adjoining or near that contain valuable minerals and are valuable for their minerals. It does not, however, conclusively follow that because there may be a claim near by that is valuable for its mineral, that, therefore, necessarily, these lands are likewise valuable, but these are facts for you to take into consideration in determining whether or not these lands are valuable for mineral; but before you can sustain this defense you must arrive at the conclusion, from the evidence, that the lands from which this timber was cut was valuable for its

minerals. A mere finding of some value in the mountainous section of this state in a particular piece of land does not indicate that that piece of land is valuable for its mineral deposits; that, I take it, is common knowledge to almost every citizen of the state of Colorado."

As further evidence of the mind of the trial court, it refused the following declarations of law requested by the defendant:

"I charge you that lands of a rocky, broken character, lying reasonably near lands in which mineral has actually been discovered, and which is so like it in general appearance that miners would be justified in prospecting it in the expectation of discovering mineral, should be classified as mineral lands under this act.

"It is not altogether a question of finding valuable ore, or metal, in the ground from which the timber is taken. The act of Congress is not limited to land which is or may be actually occupied for mining purposes."

While it may be conceded that some parts of the foregoing pronouncement of the court, independently viewed, contain some legal truths, yet they were so linked up with and fastened to other incorrect statements of the law as to vitiate the whole. Too much stress was placed upon the thought that the jury must find that the locus in quo should show valuable mineral. While advising the jury that it is not essential that the tract in question should have been worked for the mineral contained, yet this was coupled with the requirement that the land must present such indications as would justify a reasonable and prudent person experienced in such matters in spending his money in working for mineral development, in the honest belief that he could do so at a profit. So, although the person entering upon the land and cutting the timber may have been a reasonable and prudent person, unless he was also experienced in such matters, he would not be justified from the surrounding circumstances hereinbefore indicated in believing that the land on which he entered contained valuable mineral. The language of the statute is "said lands being mineral." It is not even confined to any species of mineral, and it is not necessarily synonymous with "metalliferous." Northern Pacific Railway Company v. Soderberg, 188 U. S. 526, 23 Sup. Ct. 365, 47 L. Ed. 575. It does not follow that to establish its mineral character the person removing timber from the land should be required to prove that its apparent character was such as to inspire in an experienced miner the belief that he could work it as a mine at a profit. This might be quite impracticable in making proof. In this, as in other respects, the law is intended to be a sensible thing, and in applying such a statute as this, unless otherwise restrained by its positive terms, the court should so construe it as to make it reasonably practicable within the intendment of the act. Whether or not the land in question was mineral, within the meaning of the statute as hereinbefore outlined, is a question of fact to be inferred from its surroundings and appearances, by the jury of 12, who apply to the facts their own common sense and observation. The land might be so inaccessible, or removed from water, and the like, as to forbid an attempt to work it in the reasonable hope of realizing a profit.

Again, while the charge of the court authorized the jury to take into consideration the fact of any "claim near by that is valuable for

its mineral," it immediately followed this .up, as if to impair the force of such evidence, with the warning that it would not follow that—

"necessarily these lands are likewise valuable; but before you can sustain this defense you must arrive at the conclusion, from the evidence, that the land from which this timber was cut was valuable for its minerals. A mere finding of some value in the mountainous section of this state in a particular piece of land does not indicate that that piece of land is valuable for its mineral deposits."

This was certainly most confusing. It carried with it the suggestion that, although on one part of a tract of adjoining land there was valuable mineral, it might not only fail to indicate "that that piece of land is valuable for its mineral deposits," much less could its contiguous, neighboring land, however much like it in topography and surface indications, be inferred to be mineral land. If this be a proper construction of the statute, it would result that to justify removing from the land any timber for the purposes stated in the statute, the defendant would be required to show that on every "particular piece" of a given tract valuable mineral had been found, or could, in the judgment of experienced miners, be worked as a mine at a profit. The perplexing dilemma in which the court's charge left the jury is indicated by the inquiry of the juror when the jury returned into court for further instruction, who said: "The entire evidence was that it was mineral land except one gentleman, who said that he did not see any mineral there." The only enlightenment the jury received from the court was this: "As I heretofore instructed you, in effect, it must be valuable for that purpose."

The said paragraph of the charge, as a whole, was misleading and confusing, and is not in harmony with the proper construction of the statute heretofore outlined.

If the evidence had warranted a verdict for the government, the defendant was entitled to have the jury properly advised as to the basis for the assessment of damages. The only evidence for this ascertainment was the statement contained in an affidavit given by the defendant, taken by an inspector of the Land Office Department sent out to investigate the facts respecting the alleged trespass, in which the defendant stated that the stumpage value of the timber taken was $300, and the market value in the manufactured article was $4,200. In the same affidavit, which the government put in evidence, the defendant stated that:

"As he understood the law, he had a right to cut timber to be sold to ranchmen and settlers in the vicinity; that nearly all of the timber so cut by him on the government land was sold and disposed of at his sawmill to residents in that vicinity, etc. That the cutting of the timber was not a willful act on his part, but was done with the honest belief that he had a perfect right to so do, as he understood the law."

If the defendant went upon the land and cut and removed the timber in good faith, believing that he had a right thereto, he was only answerable in damages for the stumpage value thereof, and not for the manufactured value. This is the universally recognized rule of law, and has been so applied to alleged trespasses under this statute. Gentry v. United States, 101 Fed. 51, 41 C. C. A. 185; United States

v. Gentry, 119 Fed. 70, 55 C. C. A. 658; United States v. Van Winkle, 113 Fed. 903, 51 C. C. A. 533; United States v. Homestake Mining Co., 117 Fed. 481, 54 C. C. A. 303.

The trial court had in mind a conception of this rule of law, but it fell into error, in the final concrete summing up on this matter, by saying to the jury:

"If you should find that the defendants, or either of them, went upon the government land and cut timber at the time believing that they had the right to it as their own property, and not knowing that it was off the 40 acres on which they had a right to take the timber, they are not to be charged with the value of that lumber in its manufactured state, * * * and in that event the value of the trees as they stood in the forest would be the measure of damages."

This required the jury to find, before the defendant could be accorded the benefit of the stumpage value, that the land was the defendant's "own property"; whereas, notwithstanding the title to the land may have been in the government, if in good faith, as above indicated, the defendant did the act, the government could only recover the stumpage value.

Among the requests for instructions made on behalf of the defendant touching this question is the following:

"If you find that the lands from which the timber was cut are not mineral lands, then the question arises, how much, if any, the defendants cut on government lands, and the measure of damages. I charge you that, if the defendants had good reason to believe, and in good faith did believe, that they had a right to cut and appropriate the lumber manufactured and the timber referred to and described in the complaint, and if you find that under the law I give you and the evidence, that they had no such right, then the plaintiff is entitled to recover, not the value of the lumber manufactured from the logs, but only the value of the timber in the trees as it stood on the lands before being cut; that is, the stumpage value."

But defendant's counsel made the not uncommon mistake, where a large number of instructions are asked and refused, instead of saving an exception to the refusal of each one, the bill of exceptions shows that they made one general exception to the refusal in mass. So that, if any one of the number be properly refused, the objection saved is unavailing. Moulor v. American Life Ins. Co., 111 U. S., loc. cit. 337, 4 Sup. Ct. 466, 28 L. Ed. 447; Holloway v. Dunham, 170 U. S., loc. cit. 619, 620, 18 Sup. Ct. 784, 42 L. Ed. 1165; Baggs v. Martin, 108 Fed., loc. cit. 34, 47 C. C. A. 175; Empire State Cattle Co. v. A., T. & S. F. Ry. Co., 147 Fed., loc. cit. 461, 77 C. C. A. 601. Some of the requests made by the defendant were bad, and, therefore, the exception is bad. As the case must be remanded, we have thus pointed out the law as it should be applied to the facts if retried.

Error is assigned of the action of the trial court in sustaining objections to certain questions asked of the defendant when on the witness stand. As heretofore indicated, the inspector from the Land Office Department, in investigating the facts respecting the alleged trespass, took the affidavit of the defendant made before him, in which the defendant admitted cutting and removing the timber, stating the stumpage and market value in the manufactured form thereof, admitted by him to have been cut outside of the line of the deeded land

to his wife, and expressing a willingness to settle with the government for the timber so taken at its stumpage value of $300. It also contained other statements not necessary to mention. After the government introduced this affidavit, the defendant was called, when the following occurred:

"Q. How came you to make that affidavit? (Plaintiff objects to question as immaterial. Objection sustained. Defendants except.) Q. For what purpose did you make the affidavit? (Plaintiff objects to question as immaterial. Objection sustained. Defendants except.) Q. Would you, or would you not, have made that affidavit had it not been for the promise of compromise and settlement with the agent of the United States? (Plaintiff objects to question as immaterial. Objection sustained. Defendants except.)"

The only ground of objection interposed to these questions was that they were immaterial. This was insufficient to reject the testimony sought to be elicited by the questions, unless its immateriality was clearly manifest or such as to exclude the possible circumstances making it relevant, material, or competent. Sparf et al. v. United States, 156 U. S., loc. cit. 57, 15 Sup. Ct. 273, 39 L. Ed. 343; Shandrew v. Chicago, St. P., M. & O. Ry. Co., 142 Fed. 320, 73 C. C. A. 430; Sparks v. Territory of Oklahoma, 146 Fed., loc. cit. 374, 76 C. C. A. 594. The affidavit could be employed by the prosecution only as a statement made in pais by the defendant. It had no greater force than a verbal or written admission, which is by no means conclusive on the party. He may explain the circumstances under which it was made, if for its impeachment or explanation, and as to whether the party who reduced his statement to writing embraced therein all he said. He may give in evidence all he said, as a part of the res gestæ, if it be pertinent and explanatory. Greenleaf on Evidence (16th Ed.) vol. 1, par. 201a, p. 336, states the rule as follows:

"The party against whom the admission is offered may also explain it away, so far as possible, in any other way—as, by showing that it was said with a different intent or meaning, or without personal knowledge, or the like."

See, also, Adkins v. Hershy, 14 Ark. 442; Stone v. Cook, 79 Ill. 424–429. The fact that the admission is in the form of an affidavit does not conclude the party from explaining or contradicting it. C., B. & Q. R. Co. v. Bartlett, 20 Ill. App. 96, 104; Yale v. Edgerton, 14 Minn. 194, 204 (Gil. 144); Pelton v. Schmidt, 104 Mich. 345, 62 N. W. 552, 53 Am. St. Rep. 462; Solomon R. Co. v. Jones, 30 Kan. 601, 2 Pac. 657; Sharp v. Swayn (Del.) 40 Atl. 113, 115. However, if the questions propounded were intended to develop the circumstances and all the material facts connected with the making of the affidavit, for the purpose of explanation or impairment, counsel, when the objection was made, should have advised the court what he proposed to develop, so that the court could see its competency and materiality. Origet v. Hedden, 155 U. S., loc. cit. 235, 15 Sup. Ct. 92, 39 L. Ed. 130; Guarantee Co. v. Phenix Ins. Co., 124 Fed. 170–175, 59 C. C. A. 376; Aull Savings Bank v. Aull, 80 Mo. 199; Jackson v. Hardin, 83 Mo., loc. cit. 187. This feature of the case, and its discussion, could have been obviated had the court charged, or the defendant requested it to instruct, and saved proper exception if refused, to the effect that, as the government, in order to sustain its case, had put in

evidence the statement of the defendant, which contained the sworn assertion that in taking the timber he had acted in good faith, in the honest belief that he was authorized thereto by the law, and there being no countervailing proof, the jury, if they should find for the plaintiff, could not assess the damage at a sum in excess of $300, the admitted stumpage value.

For the errors hereinbefore stated, properly preserved, the judgment of the Circuit Court must be reversed, and the cause remanded for further proceedings not inconsistent with this opinion.