# NORTHERN PACIFIC RAILWAY COMPANY *v.* SODERBERG.

## APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 61. Argued December 12, 1902.—Decided February 23, 1903.

1. Although the jurisdiction of the United States Circuit Court be originally invoked on the ground of diverse citizenship, the attribute of finality cannot be impressed upon the judgment of the Circuit Court of Appeals unless it appear that the original jurisdiction was dependent *entirely* upon such diversity of citizenship, and where the case made by the plaintiff depends upon the proper construction of an act of Congress with the contingency of being sustained by one construction, and defeated by another, it is one arising under the laws of the United States, and this court has jurisdiction thereof under section 1 of the act of 1888.
2. Lands valuable solely or chiefly for granite quarries are mineral lands within the exception and the meaning of the provisions of the act of Congress of July 2, 1864, granting, under conditions therein stated, every alternate odd-numbered section of public land *not mineral* to the amount of twenty alternate sections per mile on each side of its line to the Northern Pacific Railroad Company. The word mineral need not be construed as synonymous with metalliferous.

Land grant statutes should receive a strict construction, and one which supports the contention of the government rather than that of the individual—the sovereign rather than the grantee. Nothing passes by implication.

THIS was a bill filed by the Railway Company in the Circuit Court for the District of Washington to enjoin the defendant Soderberg from taking, removing or disposing of granite from a quarter section of land of which he had taken possession under a mineral location, and for an account of the granite quarried or removed.

The bill alleged the incorporation of the Northern Pacific Rail*road* Company under an act of Congress of July 2, 1864, with power to construct a railroad from Lake Superior to Puget Sound, with a branch line via Columbia River to Portland; the grant of every alternate odd-numbered section of public

land, *not mineral,* to the amount of twenty alternate sections per mile, on each side of the line when passing through the Territories; acceptance of the act by the Railroad Company; a joint resolution of Congress approved May 31, 1870, authorizing the company to issue bonds for the construction of the road, with a privilege to the company of building its main road by the valley of the Columbia River, with a branch across the Cascade Mountains to Puget Sound; the definite location on March 26, 1884, of the Cascade branch of the road; the completion and acceptance of the road coterminus with its public lands; the conveyance on August 3, 1896, of all its property to the Northern Pacific Railway Company, which has since continuously operated such road.

The bill further alleged that the quarter section in dispute was rough, mountainous land, the principal value of which consisted in the existence of a ledge of granite of good merchantable quality, and valuable for building stone; that the defendant in 1898 entered upon this quarter section and began to quarry, remove and dispose of such granite under a mineral location of the land in question, contending that such land is excepted from the general land grant, and that the question whether this land is mineral or non-mineral has not yet been determined by the department. Wherefore an injunction was prayed.

The answer raised no issue of fact, but averred that the lands were mineral in character and as such excepted from the grant, and that defendant having complied with the rules and regulations of the Land Department and made the proper proof, it was assumed and decided that the defendant was entitled to a patent. That he paid the proper fees to the receiver, who forwarded the proofs and records to the Land Department with a recommendation that a patent issue. The patent, however, does not seem to have been actually issued until after the beginning of this suit. The court heard the case upon a stipulation of facts and entered a decree dismissing the bill, and quieting the title of the defendant to the lands in question. 99 Fed. Rep. 506. On appeal to the Circuit Court of Appeals this decree was affirmed. 104 Fed. Rep. 425.

*Mr. C. W. Bunn* and *Mr. James B. Kerr* for appellant.

*Mr. R. A. Ballinger* and *Mr. J. T. Roland* for appellee.

*Mr. Assistant Attorney General Van Devanter* for the United States. *Mr. Assistant Attorney Pugh* was on the brief.

MR. JUSTICE BROWN, after making the foregoing statement, delivered the opinion of the court.

1. Motion was made to dismiss this appeal for the reason that, as the jurisdiction of the Circuit Court was invoked upon the ground of diverse citizenship, the decree of the Circuit Court of Appeals is final, under section 6 of the Court of Appeals act of 1891, as interpreted by the decisions of this court in *Colorado Central Mining Co.* v. *Turck*, 150 U. S. 138; *Borgmeyer* v. *Idler*, 159 U. S. 408, and *Press Publishing Co.* v. *Monroe*, 164 U. S. 105. But, to impress the attribute of finality upon a judgment of the Circuit Court of Appeals, it must appear that the original jurisdiction of the Circuit Court was dependent " entirely " upon diverse citizenship. That is not the case here. Plaintiff's bill does indeed set up a diversity of citizenship as one ground of jurisdiction, but as it appears that its title rests upon a proper interpretation of the land grant act of 1864 as to the exception of non-mineral lands, there is another ground wholly independent of citizenship under that clause of section 1 of the act of 1888, 25 Stat. 433, clothing the Circuit Court with jurisdiction of all civil suits involving over $2000, " and arising under the Constitution or laws of the United States." If the case made by the plaintiff be one which depends upon the proper construction of an act of Congress, with the contingency of being sustained by one construction and defeated by another, it is one arising under the laws of the United States. *Doolan* v. *Carr*, 125 U. S. 618; *Cooke* v. *Avery*, 147 U. S. 375. Under the allegations of the bill the fact that the Land Department had not determined whether the land in question was mineral or non-mineral, does not involve a question of fact, as the facts are admitted, but solely a question of law whether land valuable for its granite is mineral or non-mineral under the terms of the grant. *Morton* v. *Nebraska*, 21 Wall. 660. The fact that a patent issued pending suit is neither set up in the pleadings nor

noticed in the opinion of either court. The motion to dismiss must therefore be denied.

2. We are thus brought to the main question in the case, viz.: Whether lands valuable solely or chiefly for granite quarries are mineral lands within the exception of the grant of 1864? The third section of the act containing the granting clause of land "not mineral" also contains the following provisos: "*Provided further*, That all mineral lands be, and the same are hereby, excluded from the operations of this act. . . . *And provided, further*, That the word 'mineral,' when it occurs in this act, shall not be held to include iron or coal." The inference from this proviso is that in the absence of a special provision both iron and coal would be considered as minerals, and thus to repel the idea that only metals were included in the word mineral. This inference is strengthened by the fact that the day before this act was passed, July 1, 1864, 13 Stat. 343, another act was approved authorizing the public sale to the highest bidder of "any tracts embracing coal beds or coal fields," and providing that any lands not thus disposed of shall thereafter be liable to private entry. Relying largely upon this act as a "legislative declaration" this court held in *Mullan* v. *United States*, 118 U. S. 271, that coal lands are mineral lands within the meaning of that term as used in the statutes regulating the disposition of the public domain. This effectually disposes of the argument that the word "mineral" must be construed as synonymous with metalliferous.

Upon the other hand, section 2 declares that "the right, power, and authority is hereby given to said corporation to take from the public lands, adjacent to the line of said road, material of earth, stone, timber, and so forth, for the construction thereof." There is a possible inference from this that stone was not to be regarded as mineral, although it is more likely that a grant was intended of all material serviceable in the construction of the road, even though it might otherwise be excepted from the grant as a mineral. Taking these two sections together, it would seem that the reason for providing in the third section that iron and coal lands should not be deemed mineral was the same as the liberty given by the second section to take

materials of earth, stone and timber, namely, to facilitate the construction and operation of the railroad, in which large quantities of coal and iron would be required.

The word "mineral" is used in so many senses, dependent upon the context, that the ordinary definitions of the dictionary throw but little light upon its signification in a given case. Thus the scientific division of all matter into the animal, vegetable or mineral kingdom would be absurd as applied to a grant of lands, since all lands belong to the mineral kingdom, and therefore could not be excepted from the grant without being destructive of it. Upon the other hand, a definition which would confine it to the precious metals, gold and silver, would so limit its application as to destroy at once half the value of the exception. Equally subversive of the grant would be the definition of minerals found in the Century Dictionary : as "any constituent of the earth's crust ;" and that of Bainbridge on Mines : "All the substances that now form, or which once formed, a part of the solid body of the earth." Nor do we approximate much more closely to the meaning of the word by treating minerals as substances which are "mined," as distinguished from those which are "quarried," since many valuable deposits of gold, copper, iron and coal lie upon or near the surface of the earth, and some of the most valuable building stone, such, for instance, as the Caen stone in France, is excavated from mines running far beneath the surface. This distinction between underground mines and open workings was expressly repudiated in *Midland Ry. Co.* v. *Haunchwood Co.*, L. R. 20 Ch. Div. 552, and in *Hext* v. *Gill*, L. R. 7 Ch. App. 699.

The ordinance of May 20, 1785, authorizing the sale of lands in the western territory, with a reservation of "one third part of all gold, silver, lead and copper mines, to be sold or otherwise disposed of, as Congress shall hereafter direct," was evidently intended as an assertion of the right of the government to a royalty upon the more valuable metals—a prerogative which had belonged to the English Crown for centuries, though there confined to gold and silver, which were only considered as royal metals, and having its origin in the king's prerogative of coinage. 1 Black. Com. 394. While intrinsically the precious

metals are the more valuable, in the aggregate, the non-precious metals have probably contributed as much or more to the general wealth of the country.

A division of land into agricultural and mineral would also be a most uncertain guide to a proper construction of the word " mineral," since most of the lands included in the limits of this grant are neither one nor the other, but desert or rocky land, of no present value for agriculture, and of little value for their mineral deposits. So, too, the general reservations in the earlier acts of Congress of lead mines and saline springs seem to have been dictated by the fact that those were the only valuable minerals known to exist in the States to which the acts were applied, while in Michigan and Wisconsin there was a similar reservation of copper, lead and other valuable ores, which were just then being discovered and made available. In the earlier grants of Congress in aid of railroads there was generally no reservation of mineral lands, but in the grants subsequent to 1860, to the Lake Superior and Pacific roads, through unsurveyed and almost unknown territories, a reservation was invariably made of lands suspected of being rich in metals. It is quite true that, had it not been for the actual or suspected presence of these metals, Congress might not have deemed it worth while to reserve the non-metallic mineral lands; but when its attention was called to the fact that valuable mines might exist along the line of these roads, as it appears to have been about 1860, its policy was changed, and not only metalliferous but all mineral lands were reserved. Subsequent to that, it was only in States which had already received grants without reservation, or in known agricultural States, that such grants continued to be made.

Considerable light is thrown upon the Congressional definition of the word " minerals " by the acts subsequent to the Northern Pacific grant of 1864, and prior to the definite location of the line in 1884. The first of these acts, that of July 26, 1866, 14 Stat. 251, declares that the " mineral lands " of the public domain shall be free and open to exploration and occupation, subject to such rules as may be prescribed by law, and subject also to the local customs or rules of miners in the sev-

eral mining districts. The second section provides that whenever any person, or association of persons claim a vein or lode of quartz, or other rock in place, bearing gold, silver, cinnabar or copper, he shall be entitled to enter such tract and receive a patent therefor, upon complying with certain preliminaries, and with a right to follow such vein, etc., into adjoining lands. The argument made in this connection by the Railway Company would confine the term " mineral lands " to lands bearing gold, silver, cinnabar or copper, which would exclude all other metalliferous lands, such as contain iron, lead, tin, nickel, platinum, aluminum, etc.—a limitation wholly inconsistent with the use of the word " mineral " in the first section.

This act was amended July 9, 1870, 16 Stat. 217, to allow the entry of " placer " claims, " including all forms of deposit, excepting veins of quartz, or other rock in place," and declaring that they shall be subject to patent under the same provisions as vein or lode claims. As placers are merely superficial deposits, occupying the beds of ancient rivers or valleys, washed down from some vein or lode, *United States* v. *Iron Silver Mining Co.*, 128 U. S. 673, this act has little bearing upon the present case, though in *Freezer* v. *Sweeney*, 8 Montana, 508, it was held by the Supreme Court of Montana to authorize the locating and patenting of a stone quarry.

Another act having a more important bearing is that of May 10, 1872, 17 Stat. 91, " to promote the development of the mining resources of the United States," and providing in the first section that " all valuable mineral deposits " in public lands should be open to exploration and purchase, according to the local customs or rules of miners. This section is an obvious extension of section 1 of the act of 1866, above cited, by substituting the words " valuable mineral deposits in lands " for the words " mineral lands," as used in the prior act. The second section is also in line with the second section of the act of 1866, and provides that " mining claims upon veins or lodes of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, copper, or other valuable deposits heretofore located, shall be governed as to length along the vein or lode by the customs, regulations, and laws in force at the date of their

location." This section, like section 2 of the act of 1866, is susceptible of two interpretations, either that the words "valuable mineral deposits" of the first section are limited to the particular metals described in the second section, or that those metals stood in particular need of regulation as to the length and breadth of vein, and power to pursue such veins downward vertically, and even beyond the vertical side line of the locations. This appears to us the more reasonable interpretation. The fact that no such limits were imposed on veins of coal or other minerals or metals indicates, not that the act was intended to be confined to the minerals enumerated in section 2, since that would be a clear restriction upon the words "valuable mineral deposits" in the first section, but that these particular metals stood in special need of limitation and protection.

Equally pregnant with meaning is the act of June 3, 1878, 20 Stat. 89, for the sale of timber lands in California, Oregon, Nevada and Washington, which provides that "lands valuable chiefly for timber, but unfit for cultivation," as well as lands "valuable chiefly for stone," may be sold in quantities not exceeding 160 acres, with a proviso excluding mining claims, or lands containing gold, silver, cinnabar or coal. This was followed by another act, August 4, 1892, 27 Stat. 348, authorizing the entry of lands "chiefly valuable for building stone," under the placer mining laws, and extending the previous act to all public land States. This act was passed after the line of the road had been definitely located, and consequently has no direct bearing upon the case, and can only be regarded as explaining to some extent the previous reservation of all lands valuable for mineral deposits.

Conceding that in 1864 Congress may not have had a definite idea with respect to the scope of the word "mineral," it is clear that in 1884, when the line of this road was definitely located, it had come to be understood as including all lands containing "valuable mineral deposits," as well as lands "chiefly valuable for stone," and that when the grant of 1864 first attached to particular lands by the definite location of the road in 1884, the railway found itself confronted with the fact that the word "mineral" had by successive declarations of Congress

been extended to include all valuable mineral deposits. As no vested rights had been acquired by the Railroad Company prior to the definite location of its line, it took the lands in question encumbered by such definitions as Congress had seen fit to impose upon the word " mineral," subsequent to 1864.

Indeed, by the very terms of the granting act of July 2, 1864, not only are mineral lands excluded, but the grant is limited to those lands to which "the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from preëmption or other claims or rights, *at the time the line of said road is definitely fixed,* and a plat thereof filed in the office of the Commissioner of the General Land Office." It results from this that if, before the definite location of the road, Congress had withdrawn certain of these lands from the grant, the company was bound by such withdrawal and compelled to accept other lands in lieu thereof within the indemnity limits of the grant.

In construing this grant we must not overlook the general principle announced in many cases in this court, that grants for the sovereign should receive a strict construction—a construction which shall support the claim of the government rather than that of the individual. Nothing passes by implication, and unless the language of the grant be clear and explicit as to the property conveyed, that construction will be adopted which favors the sovereign rather than the grantee.

The rulings of the Land Department, to which we are to look for the contemporaneous construction of these statutes, have been subject to very little fluctuation, and almost uniformly, particularly of late years, have lent strong support to the theory of the patentee, that the words " valuable mineral deposits" should be construed as including all lands chiefly valuable for other than agricultural purposes, and particularly as including non-metallic substances, among which are held to be alum, asphaltum, borax, guano, diamonds, gypsum, resin, marble, mica, slate, amber, petroleum, limestone, building stone and coal. The cases are far too numerous for citation, and there is practically no conflict in them.

The decisions of the state courts have also favored the same

interpretation. Thus in *Gibson* v. *Tyson,* 5 Watts, 34, chromate of iron was held to be included in a reservation of all mineral. In *Hartwell* v. *Camman,* 10 N. J. Eq. 128, a grant of " all mines, minerals open or to be opened," was held to include paint stone, on the ground that it was valuable for its mineral properties—the court distinctly repudiating the idea that the term should be confined to metals or metallic ores. In *Funk* v. *Haldeman,* 53 Pa. St. 229, and in *Gill* v. *Weston,* 110 Pa. St. 313, petroleum was held to be mineral, although the act authorizing the lease of mining lands was passed before petroleum was discovered. See also *Gird* v. *California Oil Company,* 60 Fed. Rep. 531. The same principle was extended in *W. & C. Natural Gas Company* v. *De Witt,* 130 Pa. St. 235, to natural gas, which was said to be a mineral *feræ naturæ.* In *Armstrong* v. *Lake Champlain Granite Company,* 147 N. Y. 495, a conveyance of " all minerals, *and* ores," was held to include granite subsequently discovered on the premises, though it would not pass under the name of " mineral ores." In *Johnston* v. *Harrington,* 5 Washington, 73, 78, the Supreme Court of that State thought it would hardly be disputed that stone was a mineral, though it seems inconsistent with the subsequent case, in the same volume, of *Wheeler* v. *Smith,* 5 Washington, 704, holding that the term mineral was only intended to embrace deposits of ore.

The rulings of the English courts have, with a possible exception in some earlier cases, adopted the construction that valuable stone passed under the definition of minerals. Said Baron Parke in *The Earl of Rosse* v. *Wainman,* 14 M. & W. 859, 872 : " The term ' minerals,' [used in an act of Parliament, reserving to the lord all mines and minerals,] though more frequently applied to substances containing metals, in its proper sense includes all fossil bodies or matters dug out of mines ; and Dr. Johnson says that ' all metals are minerals, but all minerals are not metals ;' and mines, according to Jacob's Law Dictionary, are ' quarries or places where anything is digged ;' and in the year book, 17 Edw. 3, c. 7, " mineræ de pierre' and ' de charbon' are spoken of. Beds of stone, which may be dug by winning or quarrying, are therefore properly minerals, and so

we think they must be held to be in the clause in question, bearing in mind that the object of the act was to give the surface for cultivation to the commoners and to leave in the lord what it did not take away for that purpose." This case was followed in *Micklethwait* v. *Winter*, 6 Exch. 644, in which the same act of Parliament was held to include stone dug from quarries. In *Midland Ry.* v. *Checkley*, L. R. 4 Eq. 19, stone for road making or paving was held to be a mineral, the Master of the Rolls observing: "Stone is, in my opinion, clearly a mineral; and in fact everything except the mere surface, which is used for agricultural purposes; anything beyond that which is useful for any purpose whatever, whether it is gravel, marble, fire clay, or the like, comes within the word 'mineral' when there is a reservation of the mines and minerals from a grant of land." In *Midland Ry. Co.* v. *Haunchwood*, L. R. 20 Chan. Div. 552, brick clay was held to be a mineral; and in *Hext* v. *Gill*, L. R. 7 Chan. App. 699, the House of Lords held that china clay, and "every substance which can be got from underneath the surface of the earth for the purpose of profit," was a mineral, "unless there is something in the context or in the nature of the transaction to induce the court to give it a more limited meaning." The same rule was applied in several analogous cases of granite, sandstone, flintstone and in other similar circumstances. *Attorney General* v. *Welsh Granite Co.*, 35 W. R. 617 (granite); *Bell* v. *Wilson*, 2 Drew. & S. 395 (sandstone); *Tucker* v. *Linger*, L. R. 8 App. Cas. 508 (flintstone), and a dozen other cases to the same effect.

We do not deem it necessary to attempt an exact definition of the words "mineral lands" as used in the act of July 2, 1864. With our present light upon the subject it might be difficult to do so. It is sufficient to say that we see nothing in that act, or in the legislation of Congress up to the time this road was definitely located, which can be construed as putting a different definition upon these words from that generally accepted by the text writers upon the subject. Indeed, we are of opinion that this legislation consists with, rather than opposes, the overwhelming weight of authority to the effect that mineral lands include not merely metalliferous lands, but all such as are chiefly

valuable for their deposits of a mineral character, which are useful in the arts or valuable for purposes of manufacture.

The decree of the Court of Appeals is therefore

*Affirmed.*

MR. JUSTICE BREWER and MR. JUSTICE PECKHAM dissented.