*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| CITY OF KENAI, | ) |
| | ) Supreme Court No. S-15682 |
| Appellant, | ) |
| | ) Superior Court No. 3KN-12-00338 CI |
| v. | ) |
| | ) O P I N I O N |
| COOK INLET NATURAL GAS | ) |
| STORAGE ALASKA, LLC; STATE | ) |
| OF ALASKA, DEPARTMENT OF | ) No. 7101 - May 6, 2016 |
| NATURAL RESOURCES; and | ) |
| COOK INLET REGION, INC., | ) |
| | ) |
| Appellees. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Carl Bauman, Judge.

Appearances: Bruce E. Falconer and Patrick W. Munson, Boyd, Chandler & Falconer, LLP, Anchorage, for Appellant. Matthew Findley and Eva R. Gardner, Ashburn & Mason, P.C., Anchorage, for Appellee Cook Inlet Natural Gas Storage Alaska, LLC. John C. Hutchins, Assistant Attorney General, and Craig W. Richards, Attorney General, Juneau, for Appellee State of Alaska, Department of Natural Resources. Jahna M. Lindemuth and Katherine E. Demarest, Dorsey & Whitney LLP, Anchorage, for Appellee Cook Inlet Region, Inc.

Before: Stowers, Chief Justice, Winfree, Maassen, and Bolger, Justices. [Fabe, Justice, not participating.]

MAASSEN, Justice.

## I.      INTRODUCTION

This case involves competing claims of right to the pore space in a large limestone formation about a mile underground. Cook Inlet Natural Gas Storage Alaska, LLC (CINGSA) has leases with the holders of the mineral rights — the State of Alaska and Cook Inlet Region, Inc. (CIRI) — that allow it to use the porous formation as a reservoir for storing injected natural gas. But the City of Kenai, which owns a significant part of the surface estate above the reservoir, claims an ownership interest in the storage rights and sought compensation from CINGSA. CINGSA filed an interpleader action asking the court to decide who owns the storage rights and which party CINGSA should compensate for its use of the pore space. On summary judgment CINGSA argued that CIRI and the State own the pore space and attendant storage rights because of the State's reservation of certain subsurface interests as required by AS 38.05.125(a). The superior court granted CINGSA's motion. The City appeals both the grant of summary judgment and the superior court's award of attorney's fees to CIRI.

We affirm, concluding that the State and CIRI own the pore space and the gas storage rights and that the superior court's award of attorney's fees to CIRI was within its discretion.

## II.     FACTS AND PROCEEDINGS

### A.      Facts

#### 1.      The Cannery Loop Sterling C Reservoir Gas Storage Facility

The Cannery Loop Sterling C Gas Reservoir is located approximately a mile below the Kenai River. The reservoir began producing natural gas in 2000; gas was extracted from the "microscopic spaces between or within rocks" in the reservoir and

from natural pools contained by "[s]urrounding formations of denser, nonporous rock." The reservoir's gas supply was eventually depleted.[1]

Once gas is extracted from sedimentary rock, the emptied pore space — "microscopic spaces between or within rocks" — can be used to store "non-native gas," gas that has been extracted elsewhere. This method of gas storage can help stabilize supply and accommodate seasonal fluctuations in demand; utilities can store non-native gas in the summer and withdraw it in the winter when demand is higher. When the Sterling C Reservoir had been economically depleted, CINGSA, a public utility, proposed to convert the gas field into a storage facility for non-native gas owned by other gas and electric utilities in Southcentral Alaska.

CINGSA first had to acquire the necessary property rights from the owners of different interests in the surface and subsurface. It acquired many of those rights through negotiation and, where necessary, the process of eminent domain, available to CINGSA as a public utility. The only surface estate at issue here is that belonging to the City of Kenai, amounting to approximately 576 acres.[2] The rights to minerals underlying the property belong to the State of Alaska and Cook Inlet Region, Inc. because of mineral

---

[1] The reservoir has been described as "nearly" or "mostly depleted." This case is not concerned with the level of native gas left in the reservoir; the City's argument is that it owned the pore-space rights once the reservoir was "no longer economi[cally productive]." A gas field is said to be economically depleted when there is not enough pressure left in the field to produce the gas economically given current technology.

[2] The City owns mineral rights and storage rights in other, smaller parcels in the reservoir, but those rights are not at issue in this case, which involves only those claims that compete with the interests of CIRI and the State.

reservations required by the Alaska Land Act.³ CINGSA concluded that the State and CIRI held title to the pore space because they owned the mineral rights, and in 2011 it therefore sought and obtained leases from those entities.

### 2. Ownership of the surface and mineral estates

#### a. The surface estate

The City of Kenai received a patent for the relevant surface acreage in 1964, subject to the reservation of rights to the State required by AS 38.05.125(a) for all conveyances of State land.⁴ The mineral reservation in the patent recites the statutory language almost verbatim.

In 1973 the State granted oil and gas leases in the property and other surrounding lands to Marathon Oil Company. The leases reserved the State's right to dispose of the surface estate,⁵ as well as the State's "right [as the Lessor] to authorize the subsurface storage of oil or gas . . . in order to avoid waste or to promote conservation of natural resources."

#### b. The mineral estate

CIRI received its rights to the subsurface estate under a three-way agreement with the State and the federal government pursuant to the Alaska Native

---

³ *See* AS 38.05.125(a) ("Each contract for the sale, lease, or grant of state land, and each deed to state land, properties, or interest in state land, . . . is subject to the following reservations . . . .").

⁴ The State had acquired both the surface and subsurface rights from the federal government under the Alaska Statehood Act in 1963. The federal land patent to the State was subject to three preexisting oil and gas leases covering the CIRI property.

⁵ As relevant here, that right had already been conveyed to the City.

Claims Settlement Act (ANCSA).[6] The ANCSA-related land transfers, which took place in 1980, had as a predicate step the State's reconveyance to the United States of "all of the [State's] right, title and interest, to the subsurface estate" in the property. A few months later the United States conveyed "the subsurface estate" of the property to CIRI. Both deeds — first from the State to the federal government, then from the federal government to CIRI — were subject to "all valid existing rights therein, if any," specifically listing the Marathon oil and gas leases.

Accordingly, CIRI received the lands subject to the City's preexisting interest in the surface estate. As successor lessor of the Marathon leases, CIRI received royalties from the gas Marathon extracted.

### 3. The City of Kenai's claim that it owned the gas storage rights in the property

After CINGSA secured its leases of gas storage rights in the Sterling C Reservoir from the State and CIRI, the City asserted its own claim to the ownership of those rights. But the City allowed the storage project to go forward pending negotiations, granting CINGSA a conditional right of entry in the meantime. The right of entry provided that should "either the City of Kenai or CINGSA, in its sole discretion," determine that the parties were not making progress in negotiations, CINGSA would file an action in eminent domain and allow the courts to decide the ownership issue.

### B. Proceedings

The parties were unable to resolve their disagreement about gas storage rights, and CINGSA filed a complaint against the City in March 2012, seeking alternative forms of relief. In the first count of its complaint, CINGSA sought to acquire

---

[6]    43 U.S.C. §§ 1601-1629h (2015).

by condemnation "a gas storage easement and an easement upon the mineral interests" owned by the City in the Sterling C Reservoir. In another count, CINGSA interpleaded CIRI and the State as defendants in order "[t]o prevent double or multiple liability" given the "overlapping claims for compensation by CINGSA for use of the [property] for natural gas storage," and it asked the court to decide the party or parties CINGSA owed compensation. CINGSA also sought a "declaratory judgment confirming that the City [held] no property interest in the [gas storage rights]"; an alternative judgment that if the City *did* hold those rights CINGSA should be granted an easement by condemnation, with just compensation to the City; and — as an alternative to condemnation if the City held those rights — reformation of CINGSA's leases with the State and CIRI so that CINGSA was not obliged to pay those entities for rights that were legally the City's.

### 1. Summary judgment

CIRI and the City cross-moved for summary judgment on whether the City owned the gas storage rights. The State and CINGSA joined CIRI's motion, endorsing CIRI's position that the storage rights belonged to the State and CIRI rather than the City. The superior court granted summary judgment in favor of CINGSA, the State, and CIRI. It concluded that "the State reserved to itself the mineral estate, which includes the underground storage rights," and that "[t]he rights the City received [from the State] regarding the property in question were surface estate rights."

CINGSA and the City filed a stipulation — later approved by the superior court — to resolve all remaining condemnation issues "regarding authority and necessity, possession and just compensation and entry of final judgment against the property rights held by the City." The superior court entered final judgment in favor of CINGSA, the State, and CIRI.

## 2.    Attorney's fees

CIRI moved for an award of attorney's fees against the City, seeking 20% of its reasonable actual fees under Alaska Civil Rule 82(b)(2).  The City opposed the motion, arguing that CINGSA had initiated the suit, bringing in CIRI as a party "in its sole discretion," and that the City had not alleged any claims against CIRI that could make the City liable for CIRI's fees.  But the superior court concluded that CIRI was entitled to attorney's fees under Rule 82(b)(2) because it prevailed on the main issue in the case:  "that CIRI owns the subsurface gas storage pore spaces in dispute."  The superior court found that the amount of work done by CIRI's attorneys was reasonable, but it awarded an amount less than the scheduled 20% because it found that CIRI's Anchorage-based attorneys charged at rates higher than those customarily charged in Kenai Peninsula communities.

The City appeals the superior court's decision on summary judgment and its award of attorney's fees and costs to CIRI.

## III.    STANDARDS OF REVIEW

"We review a superior court's decision on summary judgment de novo, drawing all inferences in favor of, and viewing the facts in the record in the light most favorable to, the non-moving party."[7]  We review "a superior court's determination of prevailing party status and attorney's fees for abuse of discretion."[8]  We will find an abuse of discretion "if the award is 'arbitrary, capricious, manifestly unreasonable, or

---

[7]    *Pebble Ltd. P'ship ex rel. Pebble Mines Corp. v. Parnell*, 215 P.3d 1064, 1072 (Alaska 2009).

[8]    *BP Pipelines (Alaska) Inc. v. State, Dep't of Revenue*, 327 P.3d 185, 189 (Alaska 2014) (quoting *State v. Jacob*, 214 P.3d 353, 358 (Alaska 2009)).

stemmed from improper motive.' "[9] "We review the interpretation of Alaska Civil Rules governing the award of costs and attorney's fees de novo."[10]

## IV. DISCUSSION

The central issue in this case is the ownership of the pore space when the mineral and surface estates have been severed, as they commonly are under Alaska's mineral reservation statute, AS 38.05.125, a provision of the Alaska Land Act.[11] There

---

[9] *Wagner v. Wagner*, 183 P.3d 1265, 1266-67 (Alaska 2008) (quoting *Ware v. Ware*, 161 P.3d 1188, 1192 (Alaska 2007)).

[10] *R & Y, Inc. v. Municipality of Anchorage*, 34 P.3d 289, 300 (Alaska 2001).

[11] The specific language of the reservation is important to the discussion that follows. AS 38.05.125(a) states in full:

> Each contract for the sale, lease, or grant of state land, and each deed to state land, properties, or interest in state land, made under AS 38.05.045–38.05.120, 38.05.321, 38.05.810–38.05.825, AS 38.08, or AS 38.50 except as provided in AS 38.50.050 is subject to the following reservations: "The party of the first part, Alaska, hereby expressly saves, excepts and reserves out of the grant hereby made, unto itself, its lessees, successors, and assigns forever, all oils, gases, coal, ores, minerals, fissionable materials, geothermal resources, and fossils of every name, kind or description, and which may be in or upon said land above described, or any part thereof, and the right to explore the same for such oils, gases, coal, ores, minerals, fissionable materials, geothermal resources, and fossils, and it also hereby expressly saves and reserves out of the grant hereby made, unto itself, its lessees, successors, and assigns forever, the right to enter by itself, its or their agents, attorneys, and servants upon said land, or any part or parts thereof, at any and all times for the purpose of opening, developing, drilling, and working mines or wells on these or other land and taking

(continued...)

is a notable lack of consensus in the courts and among legal scholars on the issue of

---

[11] (...continued)
out and removing therefrom all such oils, gases, coal, ores, minerals, fissionable materials, geothermal resources, and fossils, and to that end it further expressly reserves out of the grant hereby made, unto itself, its lessees, successors, and assigns forever, the right by its or their agents, servants and attorneys at any and all times to erect, construct, maintain, and use all such buildings, machinery, roads, pipelines, powerlines, and railroads, sink such shafts, drill such wells, remove such soil, and to remain on said land or any part thereof for the foregoing purposes and to occupy as much of said land as may be necessary or convenient for such purposes hereby expressly reserving to itself, its lessees, successors, and assigns, as aforesaid, generally all rights and power in, to, and over said land, whether herein expressed or not, reasonably necessary or convenient to render beneficial and efficient the complete enjoyment of the property and rights hereby expressly reserved.

pore-space ownership.[12] This is our first opportunity to address the issue; we do it in the unique context of Alaska's land laws.

> **A. The Superior Court Properly Granted Summary Judgment To CIRI, The State, And CINGSA Because AS 38.05.125(a) Reserves The Natural Gas Storage Rights To The State.**

The City contends that as the owner of the surface it also owns the underlying pore space or natural gas storage rights. According to the City, the superior court erred when, in granting summary judgment to the other parties, it reasoned that (1) determining ownership of the storage rights is a question of statutory rather than deed interpretation; (2) the reserved rights under AS 38.05.125(a) include natural gas storage rights; and (3) the "American rule" — by which the surface owner owns the rights to underground spaces that have been depleted of their minerals — did not apply.

---

[12] *See* James Robert Zadick, Note, *The Public Pore Space: Enabling Carbon Capture and Sequestration by Reconceptualizing Subsurface Property Rights*, 36 WM. & MARY ENVTL. L. & POL'Y REV. 257, 270 (2011) ("Courts and scholars have infrequently and inconsistently treated the pore spaces." (footnotes omitted)); Victor B. Flatt, *Paving the Legal Path for Carbon Sequestration from Coal*, 19 DUKE ENVTL. L. & POL'Y F. 211, 233 (2009) ("There is no clear consensus on whether the ownership of the pore space lies with the surface estate or the mineral estate, and consideration of these rights varies significantly from state to state."); 4 NANCY SAINT-PAUL, SUMMERS OIL & GAS § 53:13, 418-20 (West 2009) ("Regardless whether underground gas storage rights are acquired by voluntary conveyance or by condemnation of the land, control and ownership rights involving the depleted storage reservoir . . . have often been the subject of litigation." (footnote omitted)); *see also* 1 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL & GAS LAW § 222, 335-36 & n.11 (Lexis 2015) ("We urge . . . adoption of the view that the mineral severance should be construed as granting exclusive rights to subterranean strata for all purposes relating to minerals, whether 'native' or 'injected,' absent contrary language in the instrument severing such minerals.").

### 1. The superior court properly addressed the ownership of storage rights as a question of statutory interpretation.

The State patents conveying the land at issue to the City recited verbatim the reservation of mineral rights that AS 38.05.125(a) generally requires. The City argues that the superior court, when determining whether the parties intended to convey or to reserve the pore-space rights, should have interpreted these reservations using rules of deed interpretation rather than statutory interpretation. We interpret the language of a deed using a three-step process: We first "look at the four corners of the document to see if it unambiguously presents the parties' intent"; if it is ambiguous, we next "consider 'the facts and circumstances surrounding the conveyance' to discern the parties' intent"; and finally, "[i]n the event that the parties' intent cannot be determined, we rely on rules of construction."[13] As for statutes, we interpret them "according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters."[14]

We conclude that statutory reservation language in an instrument of conveyance is governed by the rules of statutory interpretation. "A patent cannot convey what has been reserved by law."[15] Because patents "are to be given effect according to

---

[13] *McCarrey v. Kaylor*, 301 P.3d 559, 563 (Alaska 2013) (quoting *Estate of Smith v. Spinelli*, 216 P.3d 524, 529 (Alaska 2009)).

[14] *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011) (quoting *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999)).

[15] *Leo Sheep Co. v. United States*, 570 F.2d 881, 888 (10th Cir. 1977) *rev'd on other grounds*, 440 U.S. 668 (1979) ("The absence of an express reservation in the patent did not negative the implied reservation in the earlier grant. A patent is merely evidence of a grant, and the issuing officer acts ministerially, not judicially."); *see also Swendig v. Wash. Water Power Co.*, 265 U.S. 322, 332 (1924) (holding that patents issued "without a reservation did not convey what the law reserved"); *Chugach Natives,*
(continued...)

- 11 - **7101**

the laws and regulations under which they were issued,"[16] courts have consistently applied rules of statutory interpretation to determine the scope of contractual reservations required by statutes.[17] Accordingly, mineral reservations required by federal statutes are interpreted in light of the apparent intent of Congress, not the intent of the parties to the instrument.[18]

The language of AS 38.05.125(a) relevant here — that "[e]ach contract for the sale, lease, or grant of state land, and each deed to state land, . . . is subject to" the

---

[15] (...continued)
*Inc. v. Doyon, Ltd.*, 588 F.2d 723, 727 n.13 (9th Cir. 1978) (noting that "the conveyance of public land by a deed from the United States requires a different analysis than would be the case with private parties contracting for the conveyance of private land in which the seller reserves the subsurface or mineral estate"); *Proctor v. Painter*, 15 F.2d 974, 975 (9th Cir. 1926) (holding that although the patent did not include language reserving coal, it did not convey coal because Congress did not authorize it).

[16] *Swendig*, 265 U.S. at 332.

[17] *See, e.g.*, *BedRoc Ltd. v. United States*, 541 U.S. 176, 183-87 (2004) (reserving to the United States all coal and other "valuable minerals" in lands under the Pittman Underground Water Act); *Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 55-60 (1983) (reserving to the United States all "minerals" under the Stock-Raising Homestead Act); *Crow Tribe of Indians v. Peters*, 835 F. Supp. 2d 985, 990 (D. Mont. 2011) ("Because neither the patent nor the statute pursuant to which it was issued expressly addresses the mineral owner's use of the surface, the Court looks to rules of statutory construction for guidance.").

[18] *See, e.g.*, *Amoco Prod. Co. v. S. Ute Indian Tribe*, 526 U.S. 865, 875-78 (1999) (interpreting a statutory reservation of coal based on Congress's intent); *McCarrey*, 301 P.3d at 564-67 & n.18 (looking to the statute's language and purpose in a dispute between private parties about whether a reserved right of way required by federal statute survived the statute's repeal); *see also* Tracy Bateman Farrell et al., 53A AM. JUR. 2D *Mines and Minerals* § 38 (2016) ("The proper inquiry in interpreting mineral reservations in land grant statutes focuses on the ordinary meaning of the reservation at the time such statutes are enacted by Congress.").

statutory reservation — is mandatory.[19]  A court attempting to discern only the parties' intent with regard to the meaning of the reservation of rights could well fail to effectuate the legislative purpose behind the statute that requires that reservation.[20]  We must therefore consider AS 38.05.125(a) in determining the scope of the rights reserved in the State's patent to the City.

  **2. Interpreting AS 38.05.125(a) to include the reservation of natural gas storage rights is consistent with the statute's plain language and purpose.**

  Alaska Statute 38.05.125(a) requires that "[e]ach contract for the sale, lease, or grant of state land, and each deed to state land, properties, or interest in state land" be made subject to the State's reservation of the rights to listed natural resources:  "all oils, gases, coal, ores, minerals, fissionable materials, geothermal resources, and fossils of every name, kind or description, and which may be in or upon said land above described."  The statute also requires the reservation of rights of entry for exploration and the extraction of minerals, the reservation of surface rights necessary to support extraction, and a catchall reservation of "generally all rights and power in, to, and over

---

  **19** *See Hayes v. A.J. Assocs.*, 960 P.2d 556, 559 (Alaska 1998) ("As required by AS 38.05.125(a), the patent expressly reserved mineral rights to the State."); *Parker v. Alaska Power Auth.*, 913 P.2d 1089, 1090 (Alaska 1996) ("Alaska Statute 38.05.125 reserves minerals from every land grant.").

  **20** *See* Elizabeth A. McClanahan et al., *Title Issues:  Beyond* Amoco v. Southern Ute, REG. & DEV. OF COALBED METHANE 3-1, 2-8 (Rocky Mtn. Min. L. Found. 2002) ("The primary difference between the federal land and private land cases is that the federal land cases involve interpretation of patent language and congressional intent.  The private land cases look to intent of the parties and the more traditional legal doctrines within the courts' jurisdictions."); 3 AMERICAN LAW OF MINING § 61.05[7], at 61-26 (Rocky Mtn. Min. L. Found. 2d ed. 2015) (noting that in addressing the issue of whether a resource is a mineral reserved to the state "[t]he general rule is that the intent of the legislature will be dispositive").

said land, whether herein expressed or not, reasonably necessary or convenient to render beneficial and efficient the complete enjoyment of the property and rights hereby expressly reserved."[21]

The City contends that gas storage rights are unambiguously outside the scope of the statutory reservation because the statute reserves only "specific, identified natural resources" and the "various rights that facilitate exploitation of those [identified] natural resources." The City argues further that use of the pore space to store non-native gas does not further "exploration, development or removal of oil, gas, coal or other minerals reserved by the State." In short, according to the City, the statute reserves only "specifically identified natural resources in the land and the right to make use of the land to aid in the development and extraction of those resources," not "a place or location — the 'subsurface' " — that would include non-mineral pore space.[22]

"To establish the meaning of a statute, we examine both its text and its purpose."[23] We give statutory language a " 'reasonable or common sense construction, consonant with the objectives of the legislature.' The intent of the legislature must

---

[21] AS 38.05.125(a).

[22] The City also relies on AS 34.15.070(a), which provides that "[a] conveyance of real estate passes all the real estate of the grantor, unless the intent to pass a less estate appears by express terms or is necessarily implied in the terms of the grant." But a conveyance containing the statutory reservation very obviously intends to pass less than "all the real estate of the grantor." The question we face is thus one that AS 34.15.070(a) does not help answer — one that depends instead on the proper interpretation of AS 34.05.125(a).

[23] *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1083 (Alaska 2011).

govern and the policies and purposes of the statute should not be defeated."[24] We "presume[] that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are superfluous."[25] We also apply the rule of statutory interpretation that "[a]mbiguities in public land grants are 'resolved strictly against the grantee and in favor of the government.' "[26] This interpretive rule again highlights the distinction between statutory and deed interpretation: "Public legislation is construed broadly in favor of the government which made the grant; no rights pass by implication," while "[c]onversely, ambiguities in private deeds reserving mineral rights are construed strictly against the grantor, who is also normally the draftsman."[27]

Examining the text and purpose of AS 38.05.125(a), we reject the City's argument that rights to the pore space were not reserved to the State. We conclude that pore space is mineral and therefore within the express reach of the statutory reservation of "all . . . minerals . . . of every name, kind or description." And storage rights in a "specific[] identified natural resource[]" are included by the statute's further reservation "generally [of] all rights and power in, to, and over said land, whether herein expressed

---

[24] *Mech. Contractors of Alaska, Inc. v. State, Dep't of Pub. Safety*, 91 P.3d 240, 248 (Alaska 2004) (quoting *Mack v. State*, 900 P.2d 1202, 1205 (Alaska App. 1995)).

[25] *Nelson v. Municipality of Anchorage*, 267 P.3d 636, 642 (Alaska 2011) (quoting *Mech. Contractors of Alaska, Inc.*, 91 P.3d at 248).

[26] *McCarrey v. Kaylor*, 301 P.3d 559, 563 (Alaska 2013) (quoting *State, Dep't of Highways v. Green*, 586 P.2d 595, 603 n.24 (Alaska 1978)).

[27] Loren L. Mall, *Federal Mineral Reservations*, 20 ROCKY MTN. MIN. L. INST. 399, 410 (1975) (footnote omitted).

or not, reasonably necessary or convenient to render beneficial and efficient the complete enjoyment of the property and rights hereby expressly reserved."

"Minerals" are not defined by the Alaska Land Act. Nor have we defined the term in the context of AS 38.05.125(a), though we have stated that "[t]he question of what is a mineral is a vexatious one."[28] Other courts have concluded that the meaning of "minerals" is ambiguous and have interpreted the term broadly,[29] an approach consistent with the breadth of AS 38.01.125(a) generally.[30]

---

[28] *Norken Corp. v. McGahan*, 823 P.2d 622, 627 (Alaska 1991).

[29] *See, e.g.*, *Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 43-47 (1983) (noting that "mineral" was a broad and ambiguous term that could be interpreted as including "every description of stone and rock deposit" and concluding that gravel constituted a mineral reserved to the United States in a patent); *id.* at 42-43 ("[T]he word 'minerals' is 'used in so many senses, dependent upon the context, that the ordinary definitions of the dictionary throw but little light upon its signification in a given case.' " (quoting *N. Pac. R.R. Co. v. Soderberg*, 188 U.S. 526, 530 (1903)); *United States v. Union Oil Co. of Cal.*, 549 F.2d 1271,1273-74 (9th Cir. 1977) (broadly defining "mineral" to encompass "[a]ll elements of a geothermal system," including "magma, porous rock strata, even water itself"); *see also* 3 AMERICAN LAW OF MINING, § 84.01[2], at 84-5 (Rocky Mtn. Min. L. Found. 2d ed. 2015) ("It is futile to search for a universally applied definition of 'minerals,' as the word is used in grants and reservations. . . . Thus, in most cases, the answer to a dispute cannot be found simply by compiling a list of cases in which a particular substance has been held to have been included, or not to have been included, in grants and reservations by other persons, at other times, under other circumstances." (footnotes omitted)). *But see Bumpus v. United States*, 325 F.2d 264, 266-67 (10th Cir. 1963) (finding the term "minerals" ambiguous in a declaration of taking by the United States and concluding that gravel was not reserved as part of "other minerals" when the declaration reserved to the owners of the subsurface estate "all oil, gas and other minerals in and under said land").

[30] *See Hayes v. A.J. Assocs.*, 960 P.2d 556, 566 (Alaska 1998) (Shortell, J. pro tem, concurring) (recognizing "[t]he breadth and completeness of the rights reserved and activities authorized" by Alaska's statutory reservation).

"Pore space" is defined as "microscopic voids within rocks that are unoccupied by solid material";[31] pore space alone might thus be thought of not as mineral but as "the absence of something — a void constituted by surrounding structures."[32] But such an interpretation is too simplistic. Pore space is defined by and an inextricable part of the rock strata in which it is found: "The matrices that create pore space and give it form — such as dolomite, limestone, lignite, and sandstone — are certainly mineral in character. Without these minerals, the pore space would not exist."[33] Because porous rock formations are mineral, the parts that make them up are also mineral, including the microscopic pore space that constitutes much of these formations.[34] And because AS 38.05.125(a) broadly reserves "all . . . minerals," it reserves the constituent parts of those minerals.

Such an interpretation is supported by the statute's apparent purpose. We have recognized that "the overall purpose of the Alaska Land Act is to maximize revenue for the state"[35] and have interpreted sections of it as intended "to provide for orderly oil

---

[31]     Kevin L. Doran & Angela M. Cifor, *Does the Federal Government Own the Pore Space under Private Lands in the West? Implications of the Stock-Raising Homestead Act of 1916 for Geologic Storage of Carbon Dioxide*, 42 ENVTL. L. 527, 530 (2012).

[32]     *Id.* at 541.

[33]     *Id.* (footnote omitted).

[34]     *Id.* at 541-42 ("An additional absurdity would also arise if we consider pore space to be a discrete property interest capable of being separated from its mineral structure because then every substance treated as a mineral . . . could not be extracted without destroying the nonreserved property interest in the pore space").

[35]     *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1085 (Alaska 2011).

and gas leasing that maximizes state return on its oil and gas resources."[36]  The State identifies other statutory directives that imply a legislative concern with managing surface and subsurface uses for the maximum development of each use with minimal interference from the others.[37]  CIRI and the State thus argue that interpreting "minerals" to include pore-space rights better serves various legislative goals:  Pore space itself is a valuable State resource, its ownership is unnecessary to full enjoyment of the surface estate, and treating pore space differently from the rest of the mineral estate would be problematic for purposes of planning, leasing, and management.[38]  We agree that these are relevant statutory purposes and that they are better served by interpreting the term "mineral" to include the pore space in rock formations.

As CIRI points out, a number of federal cases have interpreted the term "minerals" in the context of statutory mineral reservations.  In *Watt v. Western Nuclear, Inc.*, the United States Supreme Court held that gravel found on lands patented under the

---

[36]     *Chevron U.S.A. Inc. v. LeResche*, 663 P.2d 923, 931 (Alaska 1983) (citing AS 38.05.180(a)).

[37]     The State cites AS 38.04.005(b) (stating as policy that "the director . . . shall seek to minimize the adverse effect of private settlement on wildlife, fishery, *mineral*, timber, and other significant resources of the land" (emphasis added)); AS 38.04.015(2) (stating that one of "[t]he primary public interests in retaining areas of state land surface in public ownership" is "to facilitate mining and mineral leasing by managing appropriate public land for surface uses which are compatible with subsurface uses"); and AS 38.04.065(b)(1) (directing the commissioner to "use and observe the principles of multiple use and sustained yield").

[38]     For example, AS 38.05.180(u) allows the Department of Natural Resources to "authorize the subsurface storage of oil or gas, whether or not produced from state land, in land leased or subject to lease under this section," which authorizes and encourages development of oil and gas resources on State lands.  It also provides for certain exemptions from lease payments otherwise due the State, for offsets against the price charged for storage, and for reporting to the Regulatory Commission of Alaska.

Stock-Raising Homestead Act (SRHA) was a "mineral" reserved to the United States by statute.[39]  The Court began its analysis by observing that "the word 'minerals' is 'used in so many senses, dependent upon the context, that the ordinary definitions of the dictionary throw but little light upon its signification in a given case.' "[40]  The Court recognized narrow, broad, and potentially unlimited definitions of the term that would lead to absurd results in the context of the SRHA.[41]  Ultimately, it concluded that the term's definition could only be determined by reference to congressional intent.[42]  It observed that "Congress' underlying purpose in severing the surface estate from the mineral estate was to facilitate the concurrent development of both surface and subsurface resources," and that "[w]hile Congress expected that homesteaders would use the surface of SRHA lands for stockraising and raising crops, it sought to ensure that valuable subsurface resources would remain subject to disposition by the United States, under the general mining laws or otherwise, to persons interested in exploiting them."[43]  It concluded that "Congress could not have expected that stock-raising and raising crops would entail the extraction of gravel deposits from the land"; therefore "the congressional purpose of facilitating the concurrent development of both surface and

---

[39]     462 U.S. 36, 60 (1983).

[40]     *Id.* at 42-43 (quoting *N. Pac. Ry. Co. v. Soderberg*, 188 U.S. 526, 530 (1903)).

[41]     *Id.* at 43-44.

[42]     *Id.* at 46-47.

[43]     *Id.* at 47.

subsurface resources is best served by construing the mineral reservation to encompass gravel."[44]

Western Nuclear is instructive to the extent it shows how legislative purpose drives the definition of "minerals" in different statutory contexts.[45] Like the SRHA, the Alaska Land Act contemplates retained State control over potential mineral wealth even as the surface estate passes to other parties for productive surface uses. Because the statutory text and persuasive authority suggest a broad interpretation of the term "minerals" in AS 38.05.125(a), and because interpreting "minerals" to include pore

---

[44] *Id.*; *see also Rosette Inc. v. United States*, 277 F.3d 1222, 1229-30 (10th Cir. 2002) (holding that the SHRA mineral reservation reserved geothermal resources even though they were not specifically named in the statute); *United States v. Union Oil Co. of Cal.*, 549 F.2d 1271, 1273-74 (9th Cir. 1977) (holding that under the SRHA's mineral reservation statute, "[a]ll of the elements of a geothermal system — magma, porous rock strata, even water itself — may be classified as 'minerals' " (footnote omitted)); *cf. BedRoc Ltd. v. United States*, 541 U.S. 176, 181-86 (2004) (holding that mineral reservation in Pittman Underground Water Act, which reserved "valuable minerals," did not extend to sand and gravel; unlike the SRHA reservation language at issue in *Western Nuclear*, Congress in the Pittman Act "textually narrowed the scope of [minerals] by using the modifier 'valuable' ").

[45] The City seeks to distinguish *Western Nuclear* on a number of grounds, contending that *Hayes v. A.J. Assocs.*, 960 P.2d 556, 566 (Alaska 1998) rejected federal law as an aid to interpreting AS 38.05.125(a). The section of *Hayes* on which the City relies was joined by two justices of a four-member court. It found that the superior court's analysis of the relationship between two federal statutes, the SRHA and the Agricultural Entry Act of 1914, 30 U.S.C. §§ 121–22 (1988), was "not helpful" as a tool to the interpretation of AS 38.05.125(a) and AS 38.05.130, "largely because we consider[ed] Alaska's statutory scheme sufficiently clear" on the point at issue: the viability of trespass claims by someone who has staked a mining claim but failed to proceed with exploration or discovery. *Id.* at 565-66. Federal law continues to be useful by analogy where Alaska law is less clear. And our reliance on *Western Nuclear*, as noted above, is simply for its observation that courts' interpretation of "minerals" as a statutory term depends on context and must be guided by the legislative purpose.

space is consistent with both the language and the purposes of the statute, we conclude that pore-space ownership is reserved as part of the mineral rights reserved. And use of that pore space as storage, even for non-native natural gas, is reserved as part of the "rights and power in, to, and over said land . . . reasonably necessary or convenient to render beneficial and efficient the complete enjoyment" of the State's other reserved mineral rights.[46]

### 3. The "American rule" does not apply.

Courts facing the issue of pore-space ownership have considered "two main theories": the American rule and the English rule.[47] "[I]n the absence of language in the severing deed dictating a different construction, the English and Canadian rule is that the cavern which remains in the land after the hard minerals are mined is owned by the mineral interest owner; the American view is that the cavern is owned by surface owners."[48] The City urges us to adopt the American rule. But we agree with the superior court that case law applying the American rule is readily distinguishable and that

---

[46] AS 38.05.125(a).

[47] 1 HOWARD R. WILLIAMS & CHARLES J. MYERS, OIL & GAS LAW § 222, 331-33 (Lexis 2015) (citing as the "leading reported cases dealing with this matter": *Cent. Ky. Gas Co. v. Smallwood*, 252 S.W.2d 866 (Ky. App. 1952) (applying the English rule), *overruled on other grounds by Tex. Am. Energy Corp. v. Citizens Fid. Bank & Trust Co.*, 736 S.W.2d 25, 28 (Ky. 1987); *Dep't of Transp. v. Goike*, 560 N.W.2d 365 (Mich. App. 1996) (applying the American rule); *Tate v. United Fuel Gas Co.*, 71 S.E.2d 65 (W. Va. 1952) (applying the American rule)); Thomas R. Decesar, Comment, *An Evaluation of Eminent Domain and a National Carbon Capture and Geologic Sequestration Program: Redefining the Space Below*, 45 WAKE FOREST L. REV. 261, 277 (2010) ("There is a split in the law between the American and English rules regarding the ownership of pore space for natural-gas storage.").

[48] *Ellis v. Ark. La. Gas Co.*, 450 F. Supp. 412, 421 (E.D. Okla. 1978) *aff'd*, 609 F.2d 436 (10th Cir. 1979).

applying the rule in this case is both unnecessary and inconsistent with AS 38.05.125(a).

The City cites *Ellis v. Arkansas Louisiana Gas Co.* as illustrating the proper application of the American rule to gas storage rights. But the court in *Ellis*, with no statutory reservation at issue, looked first and primarily to the intent of the private parties as reflected in "the deeds which effect[ed] the severance" of the mineral estate; the deeds used only words denoting "exploration, production and development," not injection, occupation, or storage.[49] The court did cite the American rule as consistent with the parties' intent to reserve to the surface owner everything other than the expressly granted right to prospect for and produce natural gas, but it recognized that the need to apply one of the presumptive rules arose only "in the absence of language in the severing deed dictating a different construction."[50] Other cases the City cites in support of the American rule also turned on the specific terms of the particular conveyance.[51]

---

[49]     *Id.* at 420.

[50]     *Id.* at 421.

[51]     *See Emeny v. United States*, 412 F.2d 1319, 1323 (Ct. Cl. 1969) (interpreting leases that granted only "specified mineral exploration and production" rights (oil and gas) "for the sole and only purpose of mining and operating," and deciding that the "clear and unambiguous" leases did not grant a right of storage; the landowners still owned "everything in such lands, except the oil and gas deposits[,] . . . [which] included the geological structures beneath the surface"); *Goike*, 560 N.W.2d at 366 (applying "plain and ordinary meaning" of statutory term "fluid mineral and gas rights" to determine that defendant landowners did not retain gas storage rights following condemnation of their property for highway improvements); *Burlington Res. Oil & Gas Co. v. Lang & Sons, Inc.*, 259 P.3d 766, 770 (Mont. 2011) ("We analyze the deeds and severance documents to determine who owns the pore space."); *Tate*, 71 S.E.2d at 71 (deciding ownership of vacant space in limestone stratum by determining owner of stratum, "[c]onsidering the entire deed with special attention to the language of the exception and giving such language its plain meaning"); *see also S. Nat. Gas Co. v. Sutton*, 406 So.2d 669, 671 (La. App. 1981) (stating that "[s]urface ownership . . .
(continued...)

We reject the City's argument that the American rule applies to a determination of the ownership of pore-space storage rights in a case, like this one, involving a reservation of rights to the State under AS 38.05.125(a). Because the rights at issue are governed by the terms of the statutory reservation, and because we interpret that reservation as including pore-space storage rights, the superior court properly determined that those rights belong to CIRI and the State as owners of the minerals rather than the City as owner of the surface estate.

**B. The Superior Court Did Not Abuse Its Discretion In Awarding Attorney's Fees To CIRI As A Prevailing Party.**

Alaska Civil Rule 82(b)(2) provides that in cases resolved without trial "[i]n which the prevailing party recovers no money judgment," the court may award the prevailing party 20% of the party's reasonable attorney's fees actually incurred. The superior court in this case concluded that CIRI was a prevailing party and entitled to attorney's fees from the City because CIRI was granted summary judgment on its claim to ownership of the disputed pore-space storage rights, which the City opposed.

The City contends this was error for two reasons. The City first argues that Rule 82 does not apply to this case, but rather Civil Rule 72, which prohibits an award of fees and costs against the condemnee in a condemnation action "[a]s a general rule." Second, the City maintains that CIRI cannot recover attorney's fees even under Rule 82 because "the City did not assert any . . . claims against CIRI," which was nominally aligned as its co-defendant in CINGSA's suit to determine the respective rights of all the parties.

---

[51] (...continued) includes the right to the use of the reservoir underlying the two acres for storage purposes," but not citing any source or rationale for this conclusion, as the only issue on appeal is the amount of compensation).

We conclude that Rule 82 governs CIRI's claim for attorney's fees. We have recognized Rule 72 as "creat[ing] a narrow exception" to the general applicability of Rule 82 for "those cases involving 'the condemnation of property under the power of eminent domain.' "[52] But the existence of a condemnation count does not mandate the application of Rule 72. In *City of Anchorage v. Scavenius*, for example, although we affirmed the superior court's denial of Rule 82 attorney's fees to the City as a condemning entity, we held that the City was properly awarded Rule 82 attorney's fees for its successful defense against a common-law counterclaim.[53] In *R & Y, Inc. v. Municipality of Anchorage*, where landowners asserted an unsuccessful inverse condemnation claim, we concluded that the Municipality was entitled to Rule 82 attorney's fees as the prevailing party.[54] We have also affirmed awards of Rule 82 attorney's fees for a party's successful defense of issues "unrelated to the eminent domain action."[55]

---

[52] *R & Y, Inc. v. Municipality of Anchorage*, 34 P.3d 289, 301 (Alaska 2001) (quoting Alaska R. Civ. P. 72(a)); *see also City of Anchorage v. Scavenius*, 539 P.2d 1169, 1173-74 (Alaska 1975) (holding that Civil Rule 72(k) trumps Rule 82 absent "clear legislative intent").

[53] 539 P.2d at 1172-79; *see also Stewart v. State, Dep't of Transp. & Pub. Facilities*, 693 P.2d 827, 831 (Alaska 1984) (summarizing our holding in *Scavenius*: a "condemnor cannot get attorney's fees under Civil Rule 82 in the initial determination of a condemnation action").

[54] 34 P.3d at 301.

[55] *Stewart*, 693 P.2d at 831 (concluding that the condemnee's efforts to acquire a temporary restraining order and preliminary injunction on the State's property were issues "unrelated" to the State's action to condemn the condemnee's property); *see also Scavenius*, 539 P.2d at 1178-79 (concluding that the condemning entity could be awarded Rule 82 fees as prevailing party in actions not considered part of the eminent domain action).

In this case, Rule 72 does not supersede CIRI's right to Rule 82 attorney's fees because CIRI's successful defense of the City's claim to ownership of the pore space was "unrelated to the eminent domain action."[56] The condemning authority was CINGSA, not CIRI. And other than with regard to minor interests not relevant here, CINGSA's complaint sought to condemn the City's rights to pore-space storage only as an alternative to a declaration that the City did not own those rights at all; the latter claim prevailed.

Even with Rule 82 as the applicable standard, the City contends that CIRI should have pursued attorney's fees "against the party that sued it — CINGSA." It argues that CIRI cannot be the "prevailing party" because CIRI and the City were co-defendants, the City asserted no cross-claims against CIRI, and the City should not be "saddled" with an award of attorney's fees based on CINGSA's "unilateral decision" to name CIRI as a defendant.

But we have rejected the argument that a party cannot be liable for attorney's fees to a party it did not sue. Recently, in *BP Pipelines (Alaska) Inc. v. State, Department of Revenue*, we reaffirmed the long-established rule that "regardless of how parties are formally arranged, fees and costs may be awarded based on actual adversity of interests."[57] In *BP Pipelines*, owners of the Trans-Alaska Pipeline System and several municipalities brought separate administrative appeals of the State Assessment Review Board's valuation of the pipeline for property tax purposes.[58] Three subsequent appeals to the superior court, involving different combinations of the pipeline owners and

---

[56] *See, e.g.*, *Stewart*, 693 P.2d at 831.

[57] 327 P.3d 185, 191-93 (Alaska 2014) (citing *Moses v. McGarvey*, 614 P.2d 1363, 1373 (Alaska 1980)).

[58] *Id.* at 187-88.

municipalities, were consolidated for a single trial de novo.[59] The central dispute involved competing valuation methods: the owners argued for one approach and the Department of Revenue, Board, and municipalities argued for another.[60] No affirmative claims were asserted between the two sides. The superior court agreed with the Department and the municipalities and ordered the owners to pay attorney's fees to them as prevailing parties.[61] We affirmed the attorney's fees award, rejecting the owners' argument that they could not be liable for the municipalities' fees because the owners' appeals were "directed against the Department and the Board, not the [o]wners," and thus the municipalities could not have been "prevailing parties" as against the owners.[62] We reasoned that an "adversity of interests" existed between the owners and the municipalities because they were clearly aligned against each other "on every substantive issue. . . . [They] were not just nominally opposing parties; they were the primary litigants."[63]

Here, the City's argument that CIRI should seek attorney's fees from CINGSA lacks merit because the "actual adversity" was between the City and the other parties, not CIRI and CINGSA. After CIRI moved for summary judgment, both CINGSA and the State joined CIRI's motion and aligned with CIRI on all issues, including the primary one of whether the City owned the storage rights. Like the owners

---

[59]     *Id.* at 188.

[60]     *Id.*

[61]     *Id.*

[62]     *Id.* at 191-92.

[63]     *Id.* at 193.

and the municipalities in *BP Pipelines*, CIRI and the City asserted no claims against each other but still acted as the "primary litigants" in arguing opposite sides of the main issue.

We conclude that the superior court did not abuse its discretion in its determination that CIRI was a prevailing party against the City or in its award of attorney's fees to CIRI pursuant to Rule 82(b)(2).

## V.  CONCLUSION

We AFFIRM the judgment of the superior court.